STATE of Minnesota, Respondent,

v.

Rico Alexander BARLOW, Appellant.

No. C2–94–1886.

Supreme Court of Minnesota.

Dec. 29, 1995.

**310**

Bradford Delapena, Asst. State Public Defender, St. Paul, for appellant.

Michael O. Freeman, Donna Wolfson, Asst. Hennepin Co. Atty., Minneapolis, Hubert H. Humphrey, III, Atty. Gen., St. Paul, for respondent.

## OPINION

COYNE, Justice.

Defendant Rico Alexander Barlow was convicted by a Hennepin County jury of two counts of murder in the first degree, Minn. Stat. §§ 609.185(1), (3), and 609.11 (1993); three counts of burglary in the first degree, Minn.Stat. §§ 609.582, subds. 1(a), (b), (c), 1a; and 609.11 (1993); one count of assault in the first degree, Minn.Stat. §§ 609.221; 609.101, subd. 2; and 609.11 (1993); and one count of assault in the second degree, Minn. Stat. §§ 609.222, subd. 1; 609.101, subd. 2; and 609.11 (1993). Barlow was sentenced to life imprisonment for the murder and a consecutive term of 120 months for burglary. On appeal Barlow does not challenge the sufficiency of the evidence but seeks a new trial on these grounds: (1) The trial judge prejudicially impaired the exercise of his peremptory challenges by erroneously denying six challenges for cause, thereby causing defendant to exhaust his peremptory challenges; and (2) the trial judge erroneously refused to admit expert testimony about the reliability of eyewitness identification. We affirm.

On October 6, 1993, David Krautkremer returned from work to find his wife, Katherine, lying dead on the floor of their Brooklyn Park home. Mrs. Krautkremer, who was on maternity leave following the birth of their 6–week–old daughter, apparently encountered the defendant while he was burglarizing the Krautkremer home. Barlow shot her at very close range in the cheek, severing the carotid artery and dealing a mortal wound. Then he placed his .380 caliber, 9 mm. Astra handgun behind her left ear and shot her a second time. The medical examiner concluded that the wounds were consistent with having been caused by a .380 caliber weapon and that death had occurred during the morning or early afternoon hours. Shortly after reporting Mrs. Krautkremer's murder, Mr. Krautkremer discovered that his wife's automobile, a tan 1992 Mazda Protege, and her keys were missing.

Police linked two other burglaries to the burglary and homicide at the Krautkremer residence. On October 4, a burglar stole a gun box containing a .380 caliber, 9 mm. Astra handgun from a residence in Richfield. Barlow's brother Isaac testified that defendant came home on October 4th with a gun box and a .380 caliber gun. Isaac also testified that he took the gun from defendant after October 6th and put it in his father's garage. Police found the gun in the senior Barlow's garage and the gun box in the apartment Isaac and the defendant shared. A thumbprint on the inside cover of the box matched that of the defendant.

The second related burglary occurred on October 6th, the day Mrs. Krautkremer was murdered. A dog was shot during the burglary of a residence in New Hope. Forensic examination disclosed that the two bullets and shell casings recovered from the Krautkremer residence and the bullet and shell casing found in the New Hope house all had been fired from the handgun Isaac Barlow had cached in his father's garage.

In the afternoon of October 6th Barlow drove a tan Mazda that he said was borrowed to the apartment of a friend, Keith Adams. Barlow's visit and the description of the car he was driving were corroborated by Adams' girlfriend, Leslie Giles, and by Donnell Scott, who also was present. After Giles left for work, the three men, Barlow, Adams, and

Scott, rode around in the Mazda. Barlow, the driver, wore gloves while in the car. After dropping off Scott, Barlow and Adams returned to Adams' apartment about 9 p.m.

Adams testified that after police had found the Mazda near Barlow's apartment, Barlow told Adams that he had shot Mrs. Krautkremer while burglarizing her home on October 6th. In addition, Adams gave the police a knapsack that Barlow had left at Adams' apartment; it was the knapsack taken from the Krautkremer home.

Adams, who was on probation for felony possession of narcotics and was charged with possession of a shotgun, said that he did not make any deal with the prosecutor for his testimony but that on his mother's advice he voluntarily talked to the police because he thought his fingerprints might be on the Mazda and he wanted to clear himself of any involvement with the murder. In fact, a fingerprint and a palmprint found on the Krautkremer Mazda were identified as Adams'.

Barlow also told his brother Isaac that he had shot Katherine Krautkremer in the face and the back of the head, and that he had shot a dog in a house in New Hope before going to the Krautkremer home. Isaac also testified to a deal relieving him from serving time in prison on two felony counts of receiving stolen goods if he testified at his brother's trial.

A cellmate, Bruce Willis, testified that shortly after Barlow's arrest on the murder charge, he told Willis that he had shot Mrs. Krautkremer in the head. Willis, convicted of nine felonies and charged with a tenth, testified pursuant to a deal with the prosecutor.

Several Richfield residents testified that on October 4, the date of the Richfield burglary in which the 9 mm. Astra was stolen, a black male, whom they identified as the defendant, came to their homes to inquire about a lost dog. Some of these witnesses said that the man had a mark or scar under one eye, but the witnesses were undecided whether it was beneath the right eye or the left. Barlow has a tattoo of the number six and two pitchforks beneath his right eye.

A woman who lived near the Krautkremers in New Hope testified that a black man with a scar beneath his left eye rang her doorbell about 10:30 a.m. on October 6th asking about a dog. The witness testified that she was sure of her identification and that when she had described the scar as being under the man's left eye, she had meant that it was at her left.

On appeal Barlow's principal contention is that the trial judge prejudicially impaired the exercise of his peremptory challenges by erroneously denying six challenges for cause. The defendant asserts that the court's error caused exhaustion of his peremptory challenges.

The defendant challenged 13 prospective jurors for cause. The trial judge dismissed seven of those challenged. Although Barlow complains that the judge denied the other six, the State asserts that the defendant peremptorily struck one of those six before giving the court an opportunity to rule on his challenge. The State concedes, however, that the trial judge may have erred in denying the challenge of one panelist.

■ Nevertheless, none of the challenged veniremen sat on the jury which tried the defendant. Although courts have traditionally been protective of the peremptory challenge, *e.g., Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), the United States Supreme Court has ruled that the necessity to exercise a peremptory challenge to strike a juror whom the trial court has erroneously refused to remove for cause does not deprive the defendant of a fair trial. *Ross v. Oklahoma,* 487 U.S. 81, 89, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988).

■ In *Ross,* the United States Supreme Court recognized that the defendant had been forced to exercise a peremptory challenge to cure the trial court's error but "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Id.* at 88, 108 S.Ct. at 2278. The Court went on to make this observation:

[P]eremptory challenges are not of constitutional dimension. [Citation omitted.] They are a means to achieve the end of an

impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

*Id.*

■ The *Ross* Court concluded that because peremptory challenges are not required by the Constitution, states may "determine the number of peremptory challenges allowed and * * * define their purpose and the manner of their exercise." Accordingly, "the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides." *Id.* at 89, 108 S.Ct. at 2279.[1]

■ More than 100 years ago this court ruled that the defendant who did not exhaust his peremptory challenges was not prejudiced by the necessity to use a peremptory challenge to remove a juror who should have been excused for cause. *State v. Lawlor,* 28 Minn. 216, 217, 9 N.W. 698, 699 (1881). More recently, in *State v. Stufflebean,* 329 N.W.2d 314, 317 (Minn.1983) the defendant, acting pro se, moved prior to the commencement of voir dire for dismissal of two members of the jury panel who were employed by a corporation owned in large part by the victim's family and whose president was the victim's father. The judge declined to dismiss the employees and during the in-chambers proceedings the judge advised Stufflebean that on voir dire he could examine the panelists for the existence of bias. Stufflebean exercised one of his five peremptory challenges to strike a manager who was acquainted with all the corporation's management personnel and who knew who the victim was but did not know her personally. Stufflebean did not challenge any of the potential jurors for cause. *Id.*

Stufflebean argued that denial of his motion to dismiss the two employees denied him a fair and impartial jury because he was forced to use one peremptory challenge to remove the management employee and could not strike the other employee because he had exhausted his remaining peremptory challenges. *Id.* Pointing out that voir dire had not revealed any actual bias on the part of the employee who served on the jury, this court held that in order to succeed in his quest for a new trial based on the deprivation of an impartial jury the defendant must show more than that he had exhausted all his peremptory challenges prior to reaching one of the challenged employees: the defendant must demonstrate the existence of actual bias or prejudice and a challenge for cause on completion of the voir dire. *Id.* at 318.

■ We have consistently adhered to the rule established in *Stufflebean. See State v. Roan,* 532 N.W.2d 563, 568 (Minn.1995); *State v. Dulak,* 348 N.W.2d 342, 344 (Minn. 1984). And we again confirm that rule. Here the defendant received 15 peremptory challenges, the number prescribed by Minn. R.Crim.P. 26.02, subd. 6. That he may have been compelled by the erroneous denial of his challenge of one or more jurors for cause to challenge those jurors peremptorily does not mean that he was deprived of a fair and impartial jury. Our review of the voir dire convinces us that with one possible exception there was no showing of actual bias on the part of the challenged jurors, and it cannot be said that the experienced trial judge abused his discretion in denying defendant's challenge for cause. Even if the declination to dismiss the one juror for cause was erroneous, the error was cured by exercise of the peremptory challenge. The peremptory served the purpose for which it is intended and the potential juror did not serve on defendant's jury.

■ Of course, Barlow contends that using his peremptory challenges to strike jurors whom the court refused to dismiss for cause resulted in the exhaustion of his peremptories. However, 11 jurors had been selected before the defendant used his 15th peremptory challenge. He immediately requested four additional peremptory challenges, and the trial judge granted two. The State ex-

**1.** The United States Courts of Appeal for the 8th, 5th and 11th Circuits have all applied the rule established in *Ross,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). *Pickens v. Lockhart,* 4 F.3d 1446, 1450–51 (8th Cir.1993); *Nethery v. Collins,* 993 F.2d 1154, 1160 n. 20 (5th Cir. 1993); and *United States v. Farmer,* 923 F.2d 1557, 1566 (11th Cir.1991).

cused the next panelist, and the following panelist was seated without challenge as the 12th juror. Accordingly, Barlow retained the two additional peremptory challenges after the full jury of 12 men and women had been selected.

The trial court elected to impanel two alternate jurors. Barlow peremptorily excused the first two prospective alternates, thereby exhausting his peremptory challenges. The next panelist was accepted as an alternate. The defendant accepted the next panelist as well, but when he complained that he would have used a peremptory if he had one left, the State agreed to dismiss this panelist. The following panelist was accepted as the second alternate juror.

Minn.R.Crim.P. 26.02, subd. 8 provides that no additional peremptory challenges may be allowed for alternate jurors but that unused peremptory challenges for the regular jury may be exercised in the selection of alternates. Accordingly, the defendant's precipitous expenditure of his two remaining peremptories on the first two prospective alternates simply placed him in the same position occupied by a good many other defendants. Defendant did not challenge either of the chosen alternates for cause; neither does he suggest any ground for such a challenge. Moreover, neither alternate juror participated in the jury's deliberations or decision.

■ Barlow's second complaint is that the trial court refused to admit expert testimony concerning scientific knowledge with respect to the reliability of eyewitness identification. This precise issue was addressed in *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980), on which the trial judge relied in the present case. In *Helterbridle* we pointed out that the basic requirement for the admissibility of scientific, technical, or other specialized knowledge is helpfulness. Minn.R.Evid. 702. "If the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject * * *, then the testimony does not meet the helpfulness test." 301 N.W.2d at 547. Here the proffered testimony did not

go to the reliability of any particular witness or the particular circumstances of the identification, and its potential for helpfulness was minimal at best. Hence, we cannot say that the trial court abused its broad discretion in deciding to exclude the testimony of defendant's expert.

Affirmed.