STATE of Minnesota, Respondent,

v.

John NMN MILES, Appellant.

No. C9–97–1639.

Supreme Court of Minnesota.

Oct. 8, 1998.

Marie L. Wolf, Asst. State Public Defender, Minneapolis, for appellant.

J. Michael Richardson, Asst. County Atty., Minneapolis, Hubert H. Humphrey III, Atty. Gen., St. Paul, for respondent.

## OPINION

STRINGER, Justice.

On the evening of July 31, 1996, three eyewitnesses observed various stages of the killing of Tyrone Harrell in an alley in north Minneapolis. Appellant John Miles was convicted of the crime but claims the trial court erred in excluding from evidence the testimony of an expert witness as to the unreliability of eyewitness testimony, and that there was insufficient evidence of his guilt. We affirm, concluding that the trial court was within its discretion to exclude the proffered testimony and that there was sufficient evidence to support the convictions.

When police responded to a report of gunfire in the alley on the 2900 block between Queen and Penn Avenue North in Minneapolis on the evening of the crime, they found the victim, Tyrone Harrell, lying dead in a driveway with a gunshot wound to his chest. Nearby was a green Jeep Cherokee, Minnesota license plate 071 ECA, crashed into a utility pole but with the engine still running. There were bullet holes in the Jeep Cherokee and shell casings near the vehicle and the victim. Bullets and casings recovered from the scene were consistent with having been fired from a single 9 mm handgun.

Three neighbors witnessed various stages of the shooting as it evolved. Eight-year old K.B. was playing basketball with her brothers in the back yard of 2914 Queen Avenue North when the Jeep Cherokee crashed into the pole less than 25 feet away. K.B. saw a man with a gun jump from behind a garage and shoot at the driver who got out of the Jeep Cherokee and ran up the alley, and she heard more gunfire as the armed man pursued the driver.

Nearby, Candra Edwards heard the gunfire and looked out the back window of 2942 Queen Avenue North. She saw a man jogging northbound up the alley holding his hand to his waist and looking over his shoulder. While she did not get a good look at his face and saw no gun, she heard something heavy and metallic fall, and she saw the man bend down as if to pick up a fallen object before he continued out of sight.

Farther up the block at 2951 Penn Avenue North, Bart Becker was taking out the trash when he heard the gunshots. He saw a man jogging northbound up the alley with his hand to his stomach. Becker and the man made eye contact briefly before the man continued past.

All the eyewitnesses described to police the person they saw as a young African–American male with some facial hair who was wearing a white shirt over black shorts. K.B. stated when shown a photographic dis-

play of six individuals that the photo of appellant "looked like the man" she had seen in the alley, but her older brother, who had also been in the back yard, identified a different photograph. Edwards identified the photo of appellant as most closely resembling the man she'd seen in the alley but that another photo also bore a resemblance. After viewing the photographs, Becker was certain that the photo of appellant was of the man he'd seen in the alley.

Two weeks before the shooting on July 17, 1996 appellant had reported a robbery to the Minneapolis police. He told a police officer that a man known to him only as "Tyrone" had robbed him at gunpoint of $50 and a gold necklace and matching bracelet. He described "Tyrone" in detail and pointed out a vehicle that he believed belonged to Tyrone: a green Jeep Cherokee with Minnesota license plate 071 ECA.

Appellant was arrested on a probable cause warrant on September 15, 1996. He denied having anything to do with Harrell's shooting and was released pending formal charges. In November of 1996, Marcell Dupree Scott contacted the police from prison to discuss what he knew of Harrell's murder.[1] Scott's story corroborated that of the eyewitnesses and included information not publicly known. Scott told authorities, and later testified at trial, that appellant had visited him early in the morning of July 18, 1996 and told him that a man named Tyrone had robbed him the night before of approximately 13 to 14 ounces of cocaine and between $15,000 and $20,000. Appellant was extremely upset about the robbery and thereafter began to carry two handguns—a 9 mm Glock and a .45. Scott testified that after the robbery Appellant began looking for Tyrone and had followed him briefly on at least two occasions in an attempt to find out where he lived.

Scott also testified as to the events on the night of the killing. His testimony was that he and Appellant were drinking and hanging out in the front yard of 2911 Penn Avenue North with some other friends when Tyrone Harrell drove by in his green Jeep Cherokee and turned west on 30th Avenue North as if to go around the block. After watching Harrell drive past, Appellant left the front yard and headed toward the alley in back. Appellant was wearing a white jersey and black shorts that night and Scott saw him look northward up the alley, gun in hand, before ducking around the garage. Hearing gunfire, Scott and the group rapidly dispersed. Scott and another friend drove to the house of appellant's uncle several blocks away where they found appellant. Appellant seemed "on edge." He told Scott "the punk tried to run" but that he had chased him and "popped him a couple more times" before running. When asked what had happened to the gun, appellant replied "they will never find that." Scott testified that the friends then drove off to find some marijuana.

Appellant was indicted on December 18, 1996 on charges of first and second-degree murder. In exchange for Scott's testimony at Appellant's trial, the state promised financial assistance for the relocation of Scott's family, immunity from prosecution for aiding an offender, and the chance for work-release four months earlier than normal eligibility.

In a pre-trial proceeding, the defense moved the court to admit the expert testimony of Dr. Edith Green on the reliability of eyewitness identification. The defense specifically wanted to introduce testimony regarding the potential for error in eyewitness identification, citing principally the lack of correlation between reliability of the identification and the level of certainty of the witness, and the lack of reliability of cross-racial identifications relating particularly to the identification testimony of Becker, the only white eyewitness. The trial court denied the motion:

> This Court finds that Dr. Green's testimony regarding the vagaries of the eyewitness identification would not be particularly helpful to the jury and in fact would tend to cause more confusion for them * * * * The jurors will be able to view the demeanor of the witnesses, evaluate the consistencies or inconsistencies of their testimony, and after the Court's instruc-

---

1. Scott had been incarcerated on a drug conviction in September of 1996.

tions, be able for themselves to determine their credibility and accuracy.[2]

During voir dire defense counsel queried virtually every venire member about the potential for error in eyewitness identifications. After jury selection, defense counsel requested a reconsideration of its motion to permit expert testimony on eyewitness identification. The trial court again denied the motion stating that the jurors "appear to be quite knowledgeable about what items may or may not create a problem with eyewitness identification * * * and my prior ruling shall stand."

Appellant's defense at trial was that he was elsewhere on the evening of July 31, 1996. Several friends and relatives of appellant testified that he had been painting walls the entire day of July 31, 1996 in preparation for moving into a house with his girlfriend. Appellant's alibi was impeached by other evidence however, indicating the move actually occurred several weeks later. The jury convicted appellant of first-degree murder and appellant was immediately sentenced to life imprisonment.

■ We note first that a trial court has wide discretion in the conduct of a trial[3] and that evidentiary rulings regarding "materiality, foundation, remoteness, relevancy, or the cumulative nature of the evidence" will be reversed only if this discretion is clearly abused.[4] The admissibility of expert testimony is within this discretion[5] and is guided by Minn. R. Evid. 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

If the expert testimony will be helpful to the jury in fulfilling its responsibilities, the evidence may be admitted.

> The basic requirement of Rule 702 is the helpfulness requirement. If the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience, then the testimony does not meet the helpfulness test.[6]

It is the trial court's responsibility to scrutinize the proffered expert testimony as it would other evidence and exclude it where irrelevant, confusing, or otherwise unhelpful.[7] In the context of expert testimony on eyewitness identification, we have held that it is not an abuse of discretion for a trial court to exclude the testimony when it does not relate to the reliability of a particular witness.[8]

■ Appellant asserts that trial court abused its discretion in excluding the expert testimony of Dr. Green regarding the accuracy of eyewitness testimony, particularly regarding the low correlation between certainty and accuracy and the statistically low reliability of cross-racial identifications. Because this information is "counter-intuitive," appellant claims its exclusion denied his right to a fair trial, particularly with respect to Becker, who was the state's strongest witness and whose cross-racial identification was crucial to the state's case.

We doubt appellant's contention that the cross-racial identification of appellant by Becker was as crucial to the state's case as appellant argues. Evidence relating to appellant's motive to avenge a robbery and ballistic and forensic evidence implicating appellant was also presented to the jury. The

**2.** *State v. Miles*, C9–97–1639, slip op. at 9 (Fourth Jud. Dist., September 9, 1997).

**3.** *State v. Koskela*, 536 N.W.2d 625, 629 (Minn. 1995).

**4.** *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 725 (Minn.1983).

**5.** *State v. Grecinger*, 569 N.W.2d 189, 194 (Minn. 1997); *State v. Riley*, 568 N.W.2d 518, 526 (Minn.1997); *Koskela*, 536 N.W.2d at 629.

**6.** *State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn.1980).

**7.** *See State v. Myers*, 359 N.W.2d 604, 609 (Minn. 1984); Minn. R. Evid. 402, 403.

**8.** *State v. Barlow*, 541 N.W.2d 309, 313 (Minn. 1995).

testimony of Scott, K. B., and Edwards, the other eyewitnesses, was obviously untainted by any frailty in cross-racial identification because they are all African–American. In addition, there is nothing in the record to suggest that expert testimony on the accuracy of eyewitness identification in general would be particularly helpful to the jury in evaluating the specific eyewitness testimony introduced against appellant.

■ But however crucial the testimony, eighteen years ago in *State v. Helterbridle*, under strikingly similar circumstances, we held that a defendant's right to a fair trial is not automatically impaired by excluding expert eyewitness testimony, but is best protected by a variety of other safeguards of our trial system:

> [W]e do not mean to suggest that we think the broader issue of reliability of eyewitness identification testimony is unimportant. Rather, we simply believe that requiring trial courts to admit this sort of evidence is not the answer. There is no one answer to the problem, but there are a number of safeguards to prevent convictions of the innocent based on unreliable eyewitness identification. Prosecutors do not have to prosecute if they think the evidence is unreliable. * * * Effective cross-examination and persuasive argument by defense counsel are additional safeguards. Proper instruction of the jury on the factors in evaluating eyewitness identification testimony and on the state's burden of proving identification beyond a reasonable doubt are other safeguards. The requirement of jury unanimity is also a safeguard. Finally, this court has the power to grant relief if it is convinced that the evidence of a convicted defendant's guilt was legally insufficient.[9]

The safeguards listed in *Helterbridle* were present in this trial. Appellant was not prosecuted until the police had more than eyewitness identifications to link him to the crime.

The jury members were extensively queried during voir dire about the frailties of eyewitness identification and were instructed by the trial court on factors to take into account when assessing eyewitness testimony. The eyewitnesses were all cross-examined as to the reliability of their testimony and in closing arguments defense counsel urged the jury to view the identifications of appellant with skepticism. While in some circumstances expert testimony relating to the accuracy of eyewitness identification may in fact be helpful to the jury, we fully agree with the trial court in this case that the jury would not be assisted by its admission and we conclude that the exclusion of such evidence was not an abuse of the trial court's broad discretion.

■ Turning next to the sufficiency of the evidence, our role in reviewing a claim of this nature is limited to ascertaining whether the jury could reasonably find the defendant guilty given the facts in evidence and the legitimate inferences which could be drawn from those facts.[10] We view the evidence in the light most favorable to the verdict and assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary.[11] "The dispositive consideration * * * is not whether reasonable doubt existed, but *whether there was sufficient evidence* for a jury to reasonably conclude that no reasonable doubt existed."[12]

■ Several types of evidence were introduced against appellant at trial. Three eyewitnesses with varying degrees of certainty identified appellant as the man they had seen in the alley behind 2911 Penn Avenue North. The eyewitness accounts are consistent with each other and are also consistent with the detailed account given by Marcell Scott about the events surrounding the party at 2911 Penn Avenue North.

**9.** *Helterbridle*, 301 N.W.2d at 547.

**10.** *State v. Johnson*, 568 N.W.2d 426, 435 (Minn. 1997) (citing *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978)).

**11.** *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989); *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989).

**12.** *State v. Walen*, 563 N.W.2d 742, 750 (Minn. 1997) (emphasis added).

 Identification is a question of fact for the jury to determine.[13] Identification testimony need not be absolutely certain; it is sufficient if the witness expresses a belief that she or he saw the defendant commit the crime.[14] The jury determines the weight and credibility of individual witnesses and of the defendant's story and a conviction may rest on the testimony of a single credible witness.[15]

In addition to the eyewitness testimony, ballistic and forensic evidence showed that the shell casings and bullets recovered from the scene were consistent with one of the guns carried by appellant. Motive was established when the jury was presented with evidence that the killing avenged a robbery the victim allegedly committed against appellant. And while appellant introduced evidence to suggest that he was with friends and family that evening painting walls, the jury was presented with ample contradictory evidence that appellant's alibi was not credible. The evidence was sufficient to support appellant's conviction.

Affirmed.

LANCASTER, J., took no part in the consideration or decision of this case.

**13.** *State v. Otten,* 292 Minn. 493, 494, 195 N.W.2d 590, 591 (1972).

**14.** *State v. Burch,* 284 Minn. 300, 313, 170 N.W.2d 543, 552 (1969).

**15.** *State v. Bliss,* 457 N.W.2d 385, 390 (Minn. 1990).