### In the Matter of the WELFARE OF C.J.W.J., Child.

No. A04–1200.

Court of Appeals of Minnesota.

June 21, 2005.

Mike Hatch, Attorney General, St. Paul, MN; and Donald F. Ryan, Crow Wing County Attorney; Candace Prigge, Assistant County Attorney, Crow Wing County Attorney's Office, Brainerd, MN, for respondent State of Minnesota.

John M. Stuart, State Public Defender, Jodie L. Carlson, Assistant Public Defender, Minneapolis, MN, for appellant C.J.W.J.

Considered and decided by RANDALL, Presiding Judge, TOUSSAINT, Judge, and HUSPENI, Judge.*

## OPINION

RANDALL, Judge.

On appeal from an order adjudicating him delinquent on one count of second-degree assault, appellant argues that (1) he was denied the effective assistance of counsel, because counsel failed to advise him on the record that he had a right to testify and he did not waive his right to do so; and (2) the evidence is insufficient to sustain the adjudication because the adjudication was based on testimony that was inconsistent on several points, including the location of the knife he allegedly used to commit the assault. We affirm.

## FACTS

Appellant C.J.W.J. was charged with two counts of second-degree assault in Crow Wing County for allegedly assaulting Leah Grembowski and Rory Buchite on August 22, 2003. Appellant pleaded not guilty, and a court trial was held on the matter.

At trial, Grembowski testified as to the following events. On the night of the alleged assault, she and her roommate Krista Wickwire had been out with their friend Justin Russell. The three arrived at Grembowski's apartment at about 1:30 a.m., the same time as her other two roommates Rory Buchite and Serena Gregerson, and four or five individuals, one of whom Grembowski identified as appellant. According to Grembowski, one of the individuals, William, had been saying some things to Gregerson, Buchite's girlfriend, and Buchite was upset about the comments. Grembowski testified that after arguing in Buchite's bedroom, Buchite and William settled their differences and shook hands.

After Buchite and William resolved the dispute, Buchite and Gregerson went into the bathroom to talk. But according to Grembowski, tensions escalated when Floyd and William followed Buchite and Gregerson into the bathroom. Grembowski testified that she then observed appellant go into the kitchen and grab a knife. Grembowski, who was standing in front of the bathroom, told appellant to put the knife away, but appellant pointed the knife at her and replied, "that was his brother in the bathroom, and that he would kill [Grembowski] and [Grembowski's baby], and anyone else who stood in his way." Grembowski testified that Wickwire also tried to persuade appellant to put the knife away, but he refused.

Following the confrontation in the hallway, appellant grabbed an empty gallon jug of liquor and went into the bathroom where the fight had started. Grembowski testified that as she walked downstairs to call the police, she observed appellant swinging the knife and the gallon jug at Buchite, who was on the floor between the toilet and the bathtub. According to Grembowski, she was able to observe the fight from the bottom of the stairs because "the window at the bottom of the stairs goes directly up." Grembowski then went outside to tell Russell about the fight. But when Grembowski asked Russell why he was not trying to break up the fight, Russell replied that "there was nothing that they could do."

Grembowski testified that she asked a neighbor to call the police, and then yelled

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

back in the apartment that the police were coming. As everybody filed out of the apartment, Grembowski observed appellant still holding the knife. Although police found a knife in the yard the next day, Grembowski testified that it was not the knife that appellant had allegedly used in the assault. Grembowski further testified that after the fight, Buchite had multiple stab wounds on his head and was still bleeding when he returned from the hospital.

Wickwire also testified as to the events and circumstance surrounding the alleged assault. According to Wickwire, she had been out with Grembowski and Russell on the night of the incident. When they arrived at the apartment, they met up with Buchite, Gregerson, and four other individuals whom she did not know. Wickwire identified appellant as one of the four individuals. According to Wickwire, the four individuals had been drinking from a gallon glass jug of Jack Daniels, and appeared to be very intoxicated.

Wickwire testified that after the group went into the apartment, Buchite and William had an argument in Buchite's bedroom. Although Buchite was upset because William had been flirting with his girlfriend, the two settled the issue. But after Buchite and Gregerson went into the bathroom to talk, William followed them into the bathroom. Wickwire, who was standing outside of the bathroom, saw appellant come down the hall with some type of butcher knife. According to Wickwire, she and Grembowski told appellant to put the knife away, but appellant pointed the knife at Grembowski and replied: "I'll kill you and your baby if I have to. Shut up and leave me alone." Wickwire then tried to grab appellant's hand, but appellant put the knife up to her throat and said: "I'll kill you, too, if I have to. Leave me alone."

After appellant threatened her with the knife, Wickwire turned and saw William punch Buchite. Appellant then grabbed the glass jug, ran into the bathroom, and started swinging the jug at Buchite. Although she turned to look away, Wickwire testified that she heard the jug make contact with Buchite. Wickwire then observed Buchite push Gregerson into the bathtub to get her out of the way. According to Wickwire, Buchite was pinned down between the toilet and the bathtub, and "[appellant] seemed to repeatedly stab at the top of [Buchite's] head, and there was blood just shooting and spraying everywhere." Wickwire then ran downstairs to call the police, which prompted appellant and his friends to leave the apartment. Wickwire later observed Buchite's injuries, and testified that Buchite had several gashes on his head from the knife, a large bump from where the glass bottle hit him, and a bruise on his face from where William punched him.

Gregerson also testified as to the events of the alleged assault. According to Gregerson, appellant and his friends had been hitting on her throughout the evening, which upset Buchite. Eventually, she and Buchite went into the bathroom to talk. However, some of appellant's friends followed them into the bathroom and would not leave when asked. Gregerson testified that tensions escalated, and William punched Buchite. Gregerson then went into the shower to hide. Gregerson testified that as she jumped into the shower, she thought she saw appellant with an empty jug of alcohol and a knife, but she was not sure because she "was really freaked out." Once she got in the shower, she could hear the assault, but she could not see anything.

On cross-examination, Gregerson recalled seeing a knife in the bathroom sink because the maintenance man had been

using it to fix the toilet. In contrast to Wickwire and Grembowski's testimony, Gregerson testified that she "assumed" that appellant had gotten the knife from the bathroom sink. Gregerson further testified that although she did not see appellant strike Buchite with the knife, she saw appellant hit Buchite with the gallon jug. Buchite did not testify at trial.

The district court found appellant guilty of the charged offenses, and the case was transferred to Beltrami County for disposition. Following a dispositional hearing, the district court adjudicated appellant delinquent. A 60–day out-of-home placement as a condition of supervised probation was imposed, but the placement was stayed pending appeal. The stayed placement was subsequently executed after appellant committed a new offense.

### ISSUES

1. Was appellant denied the effective assistance of counsel because counsel failed to advise him on the record that he had the right to testify?

2. Was the evidence sufficient as a matter of law to sustain appellant's convictions of second-degree assault?

### ANALYSIS

**I. Ineffective Assistance of Counsel**

 To prevail on a claim of ineffective assistance of counsel, the defendant must show that his attorney's representation " 'fell below an objective standard of reasonableness' and 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Gates v. State*, 398 N.W.2d 558, 561 (Minn. 1987) (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)). "[A]n attorney acts

within the objective standard of reasonableness when he provides his client with the representation of an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under the circumstances." *State v. Doppler*, 590 N.W.2d 627, 633 (Minn. 1999) (quotation omitted). A strong presumption exists that counsel's performance "falls within the wide range of reasonable professional assistance." *Pierson v. State*, 637 N.W.2d 571, 579 (Minn.2002) (quotation omitted).

 . Appellant argues that he was denied the effective assistance of counsel because there is no evidence in the record concerning whether appellant wanted to testify at trial, whether he voluntarily waived the right to testify at trial, or whether he even knew he had the right to testify. "The defendant's right to testify in his or her own defense is protected by both the [Fourteenth] Amendment Due Process Clause of the Federal Constitution and Minnesota state law." *State v. Ihnot*, 575 N.W.2d 581, 587 (Minn.1998). The waiver of the right to testify must be voluntary and knowing. *State v. Walen*, 563 N.W.2d 742, 751 (Minn.1997). Although not required in Minnesota, it is common for a trial court to confirm with the defendant on the record that his waiver of the right to testify is knowing and voluntary. *In re Welfare of M.P.Y.*, 630 N.W.2d 411, 416 (Minn.2001). But when the record is silent as to the waiver of the right to testify, the reviewing court "must presume that the decision not to testify was made by defendant voluntarily and intelligently." *State v. Smith*, 299 N.W.2d 504, 506 (Minn.1980).

Appellant acknowledges the presumption that without any evidence to the contrary, his waiver of the right to testify was voluntarily and intelligently given, but appellant asserts that because he is a juve-

nile, the presumption is not reasonable. We understand appellant's point. However, recently this court decided *In re Welfare of M.E.M.*, in which the juvenile argued that he did not waive his right to testify in his defense. 674 N.W.2d 208, 214 (Minn.App.2004). In affirming the juvenile's conviction, this court stated that because the record was silent regarding whether appellant waived his right to testify, the juvenile was presumed to have personally waived his right to testify. *Id.*

■■ Although this court affirmed the juvenile's conviction, we did caution: "[t]he district court should spend as much or more time with a juvenile than with an adult, satisfying itself that any waiver of an essential right is proper and that the juvenile understands the consequences of the waiver." *Id.* at 213–14. We repeat this cautionary instruction. With adult defendants, and *even more so with juveniles*, even after the attorney has laid the proper record, district courts should get the defendant's *personal* acquiescence to the waiver on the record (in camera or open court; whatever the district court decides).

[10] Nevertheless, the issue here was not raised before the district court, and the record is silent with respect to whether appellant waived his right to testify. Under these circumstances, appellant is presumed to have personally waived his right to testify. *Smith*, 299 N.W.2d at 506; *In re M.E.M.*, 674 N.W.2d at 214. Accordingly, we conclude that appellant was not denied the effective assistance of counsel.

## II. Sufficiency of the Evidence

■■ Appellant also contends that the evidence was insufficient as a matter of law to sustain his adjudication for second-degree assault. In considering a claim of insufficient evidence, this court's review "is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction," is sufficient to allow the fact-finder to reach the verdict that it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). The reviewing court must assume the fact-finder believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). The reviewing court will not disturb the verdict if the fact-finder, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude the defendant was guilty of the charged offense. *State v. Alton*, 432 N.W.2d 754, 756 (Minn.1988).

Appellant was adjudicated delinquent for committing second-degree assault under Minn.Stat. § 609.222, subd. 1 (2002). This statute provides: "Whoever assaults another with a dangerous weapon may be sentenced to imprisonment for not more than seven years or to payment of a fine of not more than $14,000, or both." Minn. Stat. § 609.222, subd. 1.

■ Appellant argues that it was unreasonable for the district court to find him guilty of the charged offenses because many of the state's witnesses presented inconsistent testimony. Specifically, appellant asserts that Gregerson's testimony concerning the location of the knife directly conflicts with Wickwire and Grembowski's testimony. Appellant points out that Wickwire and Grembowski testified that appellant obtained the knife from the kitchen, but Gregerson testified that appellant retrieved the knife from the bathroom sink. Appellant also asserts that Russell's trial testimony, in which he testified that Wickwire did not say anything to him about an incident involving a knife, and did not indicate any signs of distress or fear, completely contradicts Wickwire's testimony. Thus, appellant argues that his con-

viction should be reversed because the testimonial inconsistencies are significant and completely discredits the believability of the witnesses.

Appellant's argument overemphasizes the importance of some testimonial inconsistencies. Although Gregerson's testimony concerning the knife is inconsistent with Wickwire and Grembowski's testimony, Gregerson testified that she merely "assumed" that appellant had gotten the knife from the sink because a knife had been in the bathroom sink earlier in the day. Gregerson did not testify at trial that she actually saw appellant obtain the knife from the bathroom sink. Moreover, Gregerson testified that she was really did not see much of the alleged assault, and that she was "really freaked out," over the assault. Thus, Gregerson's testimonial value was minimal at best.

▮ In contrast, both Wickwire and Grembowski testified that appellant pointed the knife at Grembowski and threatened her and her unborn child.[1] Wickwire also testified that "[appellant] seemed to repeatedly stab at the top of [Buchite's] head, and there was blood just shooting and spraying everywhere." In addition, Grembowski testified that although she was walking down the stairs, she was able to observe appellant swinging the knife and the gallon jug at Buchite, who was on the floor between the toilet and the bathtub. If believed by the fact-finder, this testimony is easily enough to prove the elements of second-degree assault. *See* Minn.Stat. § 609.222, subd. 1 (stating that a person is guilty of second-degree assault if he or she assaults another with a dangerous weapon). Even with minor contradictory testimony, appellate courts defer to the fact-finder's determinations regarding the weight and credibility of individual witnesses. *See State v. Miles,* 585 N.W.2d 368, 372 (Minn.1998). When viewed in the light most favorable to the adjudication, we conclude the evidence was sufficient for the district court to reach the verdict that it did.

## DECISION

Because the record is silent with respect to whether appellant waived his right to testify, appellant is presumed to have personally waived his right to testify. The evidence is sufficient to support the adjudication of guilt.

**Affirmed.**

---

1. Grembowski explained on cross-examination that appellant would have known that she was pregnant because Grembowski told Buchite she was pregnant and that she wanted people to leave the apartment.