**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A16-0051**

State of Minnesota,
Respondent,

vs.

Justin Dillard Thomas,
Appellant.

**Filed January 17, 2017**
**Affirmed**
**Connolly, Judge**

St. Louis County District Court
File No. 69DU-CR-14-2831

Lori Swanson, Attorney General, Edwin W. Stockmeyer, Assistant Attorney General, St. Paul, Minnesota; and

Mark S. Rubin, St. Louis County Attorney, Duluth, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jodi Proulx, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Connolly, Presiding Judge; Bjorkman, Judge; and Reilly, Judge.

## S Y L L A B U S

In the absence of expert testimony proffered by a party, it is not an abuse of discretion for the district court to refuse to give a jury instruction informing a jury of recent social and scientific developments in assessing evidence.

# O P I N I O N

**CONNOLLY**, Judge

After a jury convicted appellant on charges of being a felon in possession of a firearm and of first-degree aggravated robbery, he was given an enhanced sentence of 180 months. He challenges his conviction and his sentence. We affirm.

## FACTS

In August 2014, appellant Justin Thomas, a black male then 24, and another male approached J.S., a white male, who was walking down a street. Appellant pointed a gun at J.S.'s chest, told him to empty his pockets, and frisked him. J.S. described his assailant to the police as an African-American with lighter skin, whose hair was in a ponytail, who had a goatee and a mustache, and who was wearing a dark jacket and a black and red baseball cap with the name of a Chicago team. When the police found appellant, he was removing his hair from a ponytail; he was wearing a reversible jacket with the red side out and the dark side in, and he had a red and black baseball cap with the logo of another Chicago team concealed in his jacket sleeve. While the police were speaking with appellant, a police dog following a scent from the scene of the assault approached appellant and indicated that the scent trail stopped there. Appellant was then shown to J.S., who identified him as the man with the gun.

Appellant was charged with one count of first-degree attempted aggravated robbery, one count of second-degree assault, one count of being a felon in possession of a firearm, and first-degree aggravated robbery.[1]

Based on appellant's 2003-2004 juvenile adjudications of felony aggravated battery and felony theft of a motor vehicle in Illinois; his 2008 convictions of felony first-degree burglary, felony terroristic threats, interfering with a 911 call, and four counts of misdemeanor fifth-degree assault; his 2012 convictions of driving without a valid license; his 2013 convictions of driving after suspension of his license; and his 2014 conviction of misdemeanor fifth-degree assault; the state gave notice of its intent to have appellant sentenced as a dangerous offender, a repeat offender, and a defendant unamenable to probation.

Before trial, appellant, without offering any evidentiary support or seeking a hearing, moved to have the jury instructed to consider "whether the witness and defendant's difference of race affected the accuracy of [J.S.'s] identification [of appellant]," an addition to CRIMJIG 3.19, the cautionary instruction on identification testimony.

At trial, appellant declined to testify. The state's principal witness was J.S. J.S. testified that he was "110% sure" that appellant was the man who had held a gun pointed at his chest when he saw appellant's face during a "show up" arranged by police on the night of the crime. When asked on cross-examination, "But you're 110% positive?" J.S.

---

[1] A count of receiving stolen property was dismissed during trial.

answered, "Oh [appellant's] face, yes." When asked, "[I]s it fair to say, can we agree that you weren't 110% positive?" J.S. replied, "No, sir. I was 110% positive due to the face, sir. The facial features, the hair – "

On redirect examination, J.S. was again questioned about his identification of appellant.

> Q. You testified that you saw when you were in the back seat of the squad car and the officer drove you to [appellant's] location, you were 110% sure after you saw him that it was him.
> A. Yes, ma'am. It just happened like ten minutes before that, so . . . it was pretty fresh in my memory at the time. It is still fresh in my memory right now, his face.
> . . . .
> Q. And you indicated that despite the confusion about hats, . . . whether or not he had a hood, you were 110% sure because of the face.
> A. Yes, ma'am.
> Q. That's your testimony?
> A. Yes, ma'am.
> Q. What about [appellant's] face makes you 110% sure?
> A. It was the goatee.
> . . . .
> Q. You saw the front [of appellant]?
> A. Yes, ma'am.
> Q. And it was dark; right?
> A. Yes, ma'am.
> Q. You could still see [appellant's] face; is that your testimony?
> A. Yes, ma'am.

Following a jury trial, appellant was found guilty of attempted aggravated first-degree robbery, second-degree assault, being a felon in possession of a firearm, and first-degree aggravated robbery. He waived a jury determination of aggravating sentencing factors and was sentenced to 180 months on the aggravated robbery charge and a

4

concurrent 60 months on the felon-in-possession-of-a-firearm charge, an upward departure of 69 months.

## ISSUES

1. Did the district court abuse its discretion in refusing to instruct the jury to consider the racial disparity between J.S. and appellant when deciding if J.S.'s identification of appellant was reliable?

2. Did the state prove appellant's identity beyond a reasonable doubt?

3. Did the record support the appellant's enhanced sentence?

## ANALYSIS

**1.    Racial-Disparity Jury Instruction**

The refusal to give a requested jury instruction lies within the discretion of the district court and will not be reversed absent an abuse of discretion. *State v. Cole*, 542 N.W.2d 43, 50 (Minn. 1996). The focus of the analysis is whether the refusal resulted in error. *State v. Kuhnau*, 622 N.W.2d 552, 555 (Minn. 2001). "An instruction is in error if it materially misstates the law." *Id*. at 556. Appellant does not argue that the instruction given, CRIMJIG 3.19 (the cautionary instruction on eyewitness identification), materially misstated the law.

Appellant proposed an addition to that instruction; he wanted the jury to also consider "whether [J.S.'s and appellant's] difference of race affected the accuracy of [J.S.'s] identification [of appellant]." The district court declined to add this language on the ground that the Minnesota Supreme Court has not modified CRIMJIG 3.19 to include cross-racial identification as a factor in evaluating identification testimony. Appellant

5

argues that the refusal to instruct the jury on cross-racial identification was an abuse of discretion.

This is an issue of first impression. In *State v. Miles*, 585 N.W.2d 368 (Minn. 1998), our supreme court addressed the issue of cross-racial eyewitness identification in the context of expert testimony. *Id*. at 371-72. In that case, the defense moved the court to admit the expert testimony of Dr. Edith Green on the reliability of eyewitness identification. *Id.* at 370-71.

> The defense specifically wanted to introduce testimony regarding the potential for error in eyewitness identification, citing principally the lack of correlation between reliability of the identification and the level of certainty of the witness, and the lack of reliability of cross-racial identifications relating particularly to the identification testimony of . . . the . . . eyewitness.

*Id.* at 370.

In upholding the district court's decision to exclude the testimony, a unanimous supreme court held that, "[t]he admissibility of expert testimony is within [the] discretion [of the district court] and is guided by Minn. R. Evid. 702." *Id.* at 371. The supreme court stated that, "[i]f the expert testimony will be helpful to the jury in fulfilling its responsibilities, the evidence may be admitted. . . . It is the trial court's responsibility to scrutinize the proffered expert testimony as it would other evidence and exclude it where irrelevant, confusing, or otherwise unhelpful." *Id.* (quotation omitted).

In affirming the exclusion of this evidence, the *Miles* court relied on two earlier supreme court decisions, *State v. Helterbridle*, 301 N.W.2d 545 (Minn. 1980), and *State v. Barlow*, 541 N.W.2d 309 (Minn. 1995). In *Helterbridle,* the supreme court stated:

> [W]e do not mean to suggest that we think the broader issue of reliability of eyewitness identification testimony is unimportant. Rather, we simply believe that requiring trial courts to admit this sort of evidence is not the answer. There is no one answer to the problem, but there are a number of safeguards to prevent convictions of the innocent based on unreliable eyewitness identification. Prosecutors do not have to prosecute if they think the evidence is unreliable. . . . Effective cross-examination and persuasive argument by defense counsel are additional safeguards. Proper instruction of the jury on the factors in evaluating eyewitness identification testimony and on the state's burden of proving identification beyond a reasonable doubt are other safeguards. The requirement of jury unanimity is also a safeguard. Finally, this court has the power to grant relief if it is convinced that the evidence of a convicted defendant's guilt was legally insufficient.

*Helterbridle*, 301 N.W.2d at 547, *quoted in Miles*, 585 N.W.2d at 372.

*Barlow*, another unanimous decision from our supreme court, concluded that such expert testimony was properly excluded. 541 N.W.2d at 313. It stated:

> [T]he proffered testimony did not go to the reliability of any particular witness or the particular circumstances of the identification, and its potential for helpfulness was minimal at best. Hence, we cannot say that the trial court abused its broad discretion in deciding to exclude the testimony of defendant's expert.

*Barlow*, 541 N.W.2d at 313. All of these cases remain the law of our state.

In the memorandum supporting his proposed jury instruction, appellant relied on two cases from other jurisdictions, *Commonwealth v. Gomes*, 22 N.E.3d 897 (Mass. 2015) and *State v. Henderson*, 27 A.3d 872 (N.J. 2011). Neither case has any precedential value in Minnesota. *See Mahowald v. Minn. Gas Co.*, 344 N.W.2d 856, 861 (Minn. 1984)

7

(acknowledging that foreign authorities can be persuasive but are not binding). Moreover, both cases are readily distinguishable.

*Gomes* "conclude[d] that the [district court] judge did not err by declining to instruct the jury about these [scientific] principles [regarding eyewitness identification] where the defendant offered no expert testimony, scholarly articles, or treatises that established that these principles were so generally accepted that a standard jury instruction stating [them] would be appropriate." *Gomes*, 22 N.E.3d at 900 (quotation omitted). But the *Gomes* court, having received and reviewed "the Report and Recommendations of the Supreme Judicial Court Study Group on Eyewitness Evidence," went on to conclude that "there are [five] scientific principles regarding eyewitness identification that are so generally accepted that it is appropriate in the future to instruct juries regarding these principles so that they may apply the principles in their evaluation of eyewitness identification evidence." *Id.* These five principles did not include racial disparity. *Id.* at 911-16. However, the provisional model jury instruction in an appendix to the opinion provided that, "if [the] witness and offender are of different races," the jury be instructed that "research has shown that people of all races may have greater difficulty in accurately identifying members of a different race than they do in identifying members of their own race." *Id.* at 921-22.

*Henderson* followed a remand during which a special master "presided over a hearing that probed testimony by seven experts and produced more than 2,000 pages of transcripts along with hundreds of scientific studies" in order to "evaluate scientific and other evidence about eyewitness identifications." *Henderson*, 27 A.3d at 877. The New

Jersey Supreme Court adopted the report in large part, *id.*, and observed that "[c]ross-racial recognition continues to be a factor that can affect the reliability of an identification." *Id.* at 907. The opinion requested the drafting of new jury instructions to reflect the report and specified that the instruction on cross-racial identification was to be given "whenever cross-racial identification is in issue at trial." *Id.* at 926.

Because both *Gomes* and *Henderson* were decided following and in light of intensive scientific studies mandated by the supreme courts of Massachusetts and New Jersey respectively, they are clearly distinguishable: Minnesota has no such body of evidence on which to rely and, as the district court noted, the Minnesota Supreme Court "has not modified the jury instruction [i.e., CRIMJIG 3.19] to take those things [*e.g.* cross-racial identification] into account."[2]

The district court also noted that whether to admit expert testimony on cross-racial identification "[was] not before the Court [here] because there [was] no such witness that's been offered to the Court in this particular case." Because appellant had not offered an expert witness to testify on cross-racial identification, the district court had no basis for instructing the jury on the issue. Therefore, if the instruction had been given, the jury would not have heard evidence to which it could apply. Moreover, as the state points out,

---

[2] Appellant also relied on a 2009 report of the National Academy of Sciences, *Strengthening Forensic Science in the United States: A Path Forward*, which has been cited in connection with fingerprint evidence by the supreme court in *State v. Hull*, 788 N.W.2d 91, 109-10 (Minn. 2010) (Meyer, J., concurring) and by this court in *State v. Dixon*, 822 N.W.2d 664, 668 (Minn. App. 2012). The report is a 350-page document whose index does not refer to either race or eyewitness identification, and appellant does not explain its relevance to the issue of cross-racial identification or specify any part of it pertaining to that issue.

9

expert testimony, not a jury instruction, is the appropriate way of educating jurors: an expert witness can apply theory to the particular facts of a case and is subject to cross-examination, while a jury instruction does not apply theory to the particular facts before the jury and is unopposed. *See State v. MacLennan*, 702 N.W.2d 219, 233-35 (Minn. 2005) (expert testimony on battered-child syndrome admissible if it met the standard of Minn. R. Evid. 702); *State v. Hennum*, 441 N.W.2d 793, 797-99 (Minn. 1989) (expert testimony on battered-woman syndrome admissible if it met the standard of Minn. R. Evid. 702).[3]

Appellant argues further that misidentification of him as one of the men who attempted to rob J.S. is his theory of the case and relies on *Kuhnau*, 622 N.W.2d at 557, for the proposition that "[a] defendant is entitled to an instruction on his theory of the case if there is evidence to support it." But appellant cites no evidence indicating that he had been misidentified based on cross-racial differences. Moreover, "the trial court has discretion not to instruct the jury on the [defendant's] theory." *State v. Vasquez*, 644 N.W.2d 97, 99 (Minn. App. 2002).

Finally, even if the omission of the requested instruction was error, the error was harmless. The jury was instructed to carefully consider J.S.'s testimony in light of certain specified factors. Appellant's counsel attacked J.S.'s credibility repeatedly in closing argument. Evidence independent of J.S.'s identification of appellant implicated appellant

---

[3] *But see Henderson*, 27 A.3d at 925 ("Jury charges offer a number of advantages [over expert testimony]: they are focused and concise, authoritative (in that juries hear them from the trial judge, not a witness called by one side), and cost free; they avoid possible confusion to jurors created by dueling experts; and they eliminate the risk of an expert invading the jury's role of opining on an eyewitness' credibility.") *quoted in Gomes*, 22 N.E.3d at 917.

in the crime. Instructing the jury on cross-racial identification would not have altered the verdict.

The day may come when our supreme court wishes to endorse a jury instruction regarding cross-racial identification and reassess its decisions regarding the admissibility of expert testimony on eyewitness identification. But that is not our role. "[T]he task of extending existing law falls to the supreme court or the legislature, but it does not fall to this court." *Tereault v. Palmer*, 413 N.W.2d 283, 286 (Minn. App. 1987), *review denied* (Minn. Dec. 18, 1987). One thing is clear: it is not an abuse of discretion for a district court to refuse to give such an instruction when there has been no expert testimony to support giving the instruction.

## 2. Sufficiency of the Evidence as to Identification of Appellant

If the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably have concluded that the defendant was guilty of the charged offense, this court will not disturb the verdict. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004). This court must assume that the jury believed the state's evidence and disbelieved any evidence to the contrary. *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). This is particularly true when the matter depends on conflicting testimony. *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn. 1980). "The testimony of an eyewitness that the accused is the person who committed the crime is a legitimate means of proving a defendant's guilt" and "[a]ny details affecting the reliability of the testimony . . . go to the weight the trier of fact should give to the testimony,

11

not to its admissibility." *State v. Mosley*, 853 N.W.2d 789, 798 (Minn. 2014).[4]  The jury, not the reviewing court, is responsible for weighing the credibility of eyewitness testimony; thus, "the positive and uncontradicted testimony of a victim may be sufficient by itself to support a conviction." *State v. Foreman*, 680 N.W.2d 536, 539 (Minn. 2004).  J.S.'s testimony was positive and uncontradicted; it was sufficient to support appellant's conviction.  *See id.*

Appellant relies on *State v. Gluff*, 285 Minn. 148, 151-53, 172 N.W.2d 63, 65-66 (1969) (reversing a conviction on the ground that the victim's identification of the defendant was not trustworthy), but *Gluff* is distinguishable here, as it was in *Foreman*. *See Foreman*, 680 N.W.2d at 539 (distinguishing *Gluff* on the ground that "the witness had seen the perpetrator for only a short time and there had been errors in the lineup process"). Here, J.S. identified appellant within minutes of the incident; in *Gluff*, seven days elapsed before the victim, who had been working as a motel registration clerk when held up by robbers, was shown hundreds of photographs, selected the photograph of a man who had stayed at the motel about two weeks earlier, and then identified the man in the photograph as one of the robbers.  *Gluff*, 285 Minn. at 149-50, 172 N.W.2d at 64.  Here, J.S. had observed very specific details of appellant's appearance; in *Gluff*, the victim said she had only seen him for 30 seconds before becoming aware that he was holding a gun, which was the only thing she looked at for the rest of the robbery.  *Id.* at 150, 172 N.W.2d at 64.  Here, J.S. described his assailant as having the facial hair, skin color, and hair style of appellant,

---

[4] Appellant did not challenge the admissibility of J.S.'s identification of him at trial.

12

wearing a jacket that was the color of the inside of the reversible jacket appellant was found wearing, and wearing a baseball cap of a Chicago team that used the same colors as the Chicago team whose cap appellant had. In *Gluff*, the victim described the robbers as 19 or 20 and "unshaven but clean-cut" but identified an individual who was 32, with receding hair, a facial cyst, and a facial scar, none of which she mentioned in her description. *Id.*, 172 N.W.2d at 64.

Moreover, in *Gluff,* "[t]here was no corroboration of the identification." *Id.* at 151, 172 N.W.2d at 65. Here, J.S.'s identification of appellant was corroborated by four facts. First, appellant's appearance matched J.S.'s description of an African-American with lighter skin, whose hair was in a ponytail, who had a goatee and a mustache, and who was wearing a dark jacket (one side of appellant's reversible jacket was dark) and a black and red baseball cap. Second, when the police found appellant, he was removing his hair from the ponytail, the dark side of his jacket had been put on the inside, with the red side visible, and the cap was concealed in the jacket sleeve. Third, appellant appeared to have recently exerted himself: he was sweaty and said he was hot, although the temperature was in the 50s. Fourth, a police dog independently tracked a human scent from the scene of the incident directly to appellant. Thus, J.S.'s identification of appellant was not uncorroborated. Appellant's reliance on *Gluff* is misplaced.

**3.  The Dangerous-Offender Sentence**

"We review a sentencing court's departure from the sentencing guidelines for [an] abuse of discretion." *State v. Geller*, 665 N.W.2d 514, 516 (Minn. 2003). A sentence will be affirmed if the district court's decision was legally permissible and supported by the

record. *State v. Vickla*, 793 N.W.2d 265, 269 (Minn. 2011). Under Minn. Stat. § 609.1095 (2016), the dangerous-offender statute, the sentencing court considers the defendant's criminal history. *State v. Neal*, 658 N.W.2d 536, 546 (Minn. 2003). "Having "[t]wo or more prior convictions for violent crimes" when being sentenced for another violent crime renders a defendant liable to an enhanced sentence. Minn. Stat. § 609.1095, subd. 2.

At the time appellant was sentenced for first-degree aggravated robbery in October 2015, he had a 2013 conviction for third-degree assault, and 2008 convictions for first-degree burglary and felony terroristic threats. All four crimes are "violent crimes" under the dangerous-offender statute. Minn. Stat. § 609.1095, subd. 1 (d). Appellant does not dispute that he meets the statutory criteria for sentencing as a dangerous offender, nor does he argue that the district court's decision was not legally permissible or is not supported by the record. *See Vickla*, 793 N.W.2d at 269.

Appellant argues that the district court failed to state on the record that appellant met the statutory criteria and to make specific findings supporting its conclusion that appellant is a dangerous offender. The district court said to appellant:

> [Your] prior record . . . shows at least seven prior assaults, some of them significant, other[s] perhaps not so significant, as well as other felony behavior.
> I understand . . . that you are only 25 years old, but given the circumstances, the Court believes that the [s]tate has established that you are a dangerous offender with prior felonies that put you in the enhanced sentence situation.

There is no requirement that a district court state the specific felonies that put an offender into the dangerous-offender category, only that it "determine[] on the record at the time of sentencing that the offender has two or more prior convictions for violent crime." Minn.

Stat. § 609.1095, subd. 2(1). The district court said that the state had established "prior felonies that put [appellant] in the enhanced sentence situation," i.e., in the dangerous-offender category; it did not need to specify which of appellant's seven undisputed felony convictions were involved.

Appellant also argues that "[t]he record was insufficient to find that [he] was a dangerous offender" because five years elapsed between committing his second felony and his third (July 30, 2007, to April 4, 2013). But appellant was not released from prison after the 2007 conviction until April 21, 2011, and he was under parole supervision until May 25, 2012. His record supports the determination that he is a danger to public safety as defined in Minn. Stat. § 609.1095, subd. 2(2)(i) (providing that a defendant who has two or more prior convictions for violent crimes "is a danger to public safety" if his past criminal behavior indicates a "high frequency rate of criminal activity or juvenile adjudications, or long involvement in criminal activity including juvenile adjudications").

Finally, appellant relies on *State v. Branson*, 529 N.W.2d 1 (Minn. App. 1995) (in which the defendant's criminal involvement extended over 18 years), *review denied* (Minn. Apr. 18, 1995) and *State v. Kimmons*, 502 N.W.2d 391 (Minn. App. 1993) (in which the defendant committed eight prior felonies), *review denied* (Minn. Aug. 16, 1993), to argue that a more extensive criminal record than his is "necessary to support a finding that a defendant is a 'dangerous offender.'" But the criteria for dangerous offenders are set out

in the statute, and the fact that other offenders have accumulated more extensive criminal records does not preclude appellant from meeting those criteria.[5]

## D E C I S I O N

In light of appellant's failure to offer any expert-witness support for his request that the jury be instructed on cross-racial identification, there was no abuse of discretion in the denial of that request; the evidence as to appellant's identity was sufficient for the jury to reasonably have concluded that appellant was guilty; and appellant met the statutory criteria for sentencing as a dangerous offender.

**Affirmed.**

---

[5] In his pro se brief, appellant argues that he is entitled to a new trial because the district court "never obtained [his] consent to charge the jury . . . regarding his failure to testify [i.e., CRIMJIG 3.17]." But the transcript indicates that the district court read CRIMJIG 3.17 to appellant and told him that whether the instruction would be read to the jury "is a decision you and your attorney have to make." Appellant's attorney then addressed appellant: "Now, we know this instruction. You just heard it. I agree with the judge [and] would recommend that we use it. Would you like it used at this time?" Appellant answered, "Yes, I would." Thus, appellant's consent to reading the jury instruction on his failure to testify was obtained. For this argument, appellant relies on *State v. Thompson*, 430 N.W.2d 151 (Minn. 1988), but that case does not support his position or his request for a new trial. "[A] defendant is [not] entitled to a new trial simply because the record on appeal is silent as to whether the defendant and his attorney wanted the instruction . . . ." *Id.* at 153. Here, the record is not silent: appellant's pro se argument fails.