**James Leroy SCOTT, petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. A09–1769.**

Supreme Court of Minnesota.

Sept. 23, 2010.

David W. Merchant, Chief Appellate Public Defender, Melissa Sheridan, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, Wm. F. Klumpp, Jr., Assistant Attorney General, St. Paul, MN; and Charles Rasmussen, Todd County Attorney, Long Prairie, MN, for respondent.

## OPINION

PAGE, Justice.

After a 1992 jury trial, appellant James Leroy Scott was found guilty and subsequently convicted of first-degree murder in Todd County District Court and sentenced to life in prison. At trial, as it did in *Gassler v. State*, 787 N.W.2d 575 (Minn. 2010), the State presented the testimony of

an FBI agent who, relying on Composite Bullet Lead Analysis (CBLA),[1] testified that a pellet recovered from the victim's body "could have" come from a box of ammunition tied to Scott and that the pellet from the victim's body and pellets from the box of ammunition connected to Scott were likely manufactured by Federal Cartridge in Anoka, Minnesota, "on or about the same date." Scott's conviction, which we affirmed on direct appeal, became final on March 11, 1993.[2]

In 2007, the FBI made it known that there was an "inability of scientists and manufacturers to definitively evaluate the significance of an association between bullets made in the course of a bullet lead examination." On April 28, 2008, Scott filed a petition for postconviction relief arguing that he had been convicted based on false evidence. However, under Minn. Stat. § 590.01 (2008), for anyone convicted before August 1, 2005, petitions for postconviction relief must be filed by July 31, 2007, unless one of the statute's exceptions apply. Scott claimed that two of the exceptions to the time bar applied in his case: the newly discovered evidence exception and the interests of justice exception. The postconviction court held that neither exception applied and denied Scott's petition as time barred. For the reasons indicated below, we affirm.

At trial, the State presented evidence establishing the following facts. Dale Yungk was murdered early on the morning of April 14, 1990. His body was found on the side of a rural road in Todd County at around 7 a.m. Yungk had been shot three times in the area of his head and back with a shotgun and died from loss of blood.

The events leading to Yungk's death began in January 1990. On the night of January 14, 1990, police officers investigated a suspicious car outside a Roseville catering business. The officers identified the driver as Robert Gassler and the only passenger as Yungk. The officers discovered burglary tools, a sledgehammer, a large knife, and a .25 caliber semi-automatic pistol in the car. The officers arrested Gassler, but ultimately neither he nor Yungk was charged with the burglary. At the time of this incident, Yungk and Dale Lessard were living at the residence of Gordon Beckman, and Gassler lived there sporadically.

On the night of April 13, 1990, a friend of Yungk's attempted to contact him at Beckman's residence. The friend telephoned at around 9 p.m., and Yungk told him to call back. When the friend called back the next morning, he was told that Yungk had left the residence with Gassler and Scott. That same morning, Veronica Yarbough, a close friend of Scott, went to her mother's house and saw Gassler and Scott, who both looked very tired. Gassler told Yarbough that he and Scott had killed Yungk and left his body on the side of the road "to prove a point." Scott, who was in the room at the time the statement was made, did not respond to Gassler's statement. Similarly, Ricky Foster testified that Scott and Gassler arrived at his home on April 14. Gassler had a sawed off shotgun that was wrapped in white surgical tape and smelled of gunpowder as if it had been recently fired. Scott had a hand-

1. Composite Bullet Lead Analysis is also known as Comparative Bullet Lead Analysis. For a detailed discussion of the CBLA process, see our opinion in *Gassler v. State,* 787 N.W.2d 575, 579–81 (Minn.2010).

2. The evidence underlying Scott's conviction can be found in our opinion affirming his conviction on direct appeal, *State v. Scott,* 493 N.W.2d 546 (Minn.1992), and will be repeated in this opinion only as necessary to resolve the issues raised in this appeal.

gun. Scott and Gassler asked Foster's mother, Beverly Munoz, who arrived at the home several days later, to keep a suitcase in her room for them. After an altercation with Scott and Gassler on April 19, Munoz ordered Scott and Gassler to leave. The next day, Munoz turned the suitcase over to the police. Among other things, police found a sawed off shotgun and shotgun shells in the suitcase.

The State also called Joseph Myers, an inmate and childhood friend of Scott, who testified that Scott told him that he had been at Yarbough's house the day that Gassler told Yarbough about his involvement in Yungk's murder, heard Gassler's statement, and was upset with Gassler for having told Yarbough. Myers described Scott's confession in detail. According to Myers, Scott told him the murder took place when Gassler, Yungk, and Scott were returning to the Twin Cities after a failed burglary attempt in the Todd County area. They stopped along the road "somewhere around Staples or Walker" so that Scott and Yungk could relieve themselves in a ditch at the side of the road. Scott told Myers that Yungk panicked and ran. Scott reacted by grabbing a shotgun and shooting Yungk, who then fell into the ditch. Scott walked up to Yungk, put the shotgun to Yungk's head, and fired the shotgun again. When Gassler caught up with Scott and Yungk, Scott gave the shotgun to Gassler and told him to shoot Yungk, which Gassler did, firing the shotgun into Yungk's head. Scott then retrieved the three casings from the spent shells and later threw them away, along with the shoes he wore that night.

The State also introduced testimony from Special Agent John P. Riley of the Federal Bureau of Investigation (FBI). Special Agent Riley testified that using CBLA he examined 10 shotgun pellets that were removed from Yungk's body and compared them against ammunition found in the suitcase recovered from Munoz. Based on his examination, Agent Riley testified that the pellets removed from Yungk's body and the pellets from the ammunition found in the suitcase received from Munoz were all likely to have been manufactured by Federal Cartridge on or about the same date and were likely to have come from the same box of ammunition.

In 2004, following a request from the FBI to investigate CBLA testing, the National Research Council reported that CBLA data does not permit definitive statements concerning the origins of the bullets and that bullets originating from different sources can be indistinguishable. Nat'l Research Council, *Forensic Analysis Weighing Bullet Lead Evidence* 12–13 (2004).

In 2005, the FBI indicated that while it "still firmly support[ed] the scientific foundation of bullet lead analysis," it would stop using CBLA because of its relative probative value as compared to its cost. Press Release, Fed. Bureau of Investigation, FBI Laboratory Announces Discontinuation of Bullet Lead Examinations (Sept. 1, 2005), *available at* http://www.fbi.gov/pressrel/pressrel105/bullet_lead_analysis.htm. In 2007, following a report by CBS News and *The Washington Post*, the FBI acknowledged that the "messages on the discontinuation of bullet lead analysis were not clear enough and getting to the right people." Press Release, Fed. Bureau of Investigation, FBI Laboratory to Increase Outreach in Bullet Lead Cases (Nov. 17, 2007), *available at* http://www.fbi.gov/pressrel/pressrel107/bulletlead111707.htm. The FBI also acknowledged that the primary reason that the use of CBLA was discontinued was "the inability of scientists and manufacturers to definitively evaluate the significance of an association between

bullets made in the course of a bullet lead examination." *Id.* In a January 2009 letter to the Minnesota Attorney General's office, the FBI indicated that Agent Riley's testimony that the pellets removed from Yungk and the pellets tied to the ammunition received from Munoz came from the same box was inappropriate and not supported by science.

The State contends that because Scott's petition was not filed on or before July 31, 2007, the petition is barred by the two-year statute of limitations set out in the postconviction statute, Minn.Stat. § 590.01. In 2005, the legislature amended the postconviction statute to provide, "[n]o petition for postconviction relief may be filed more than two years after the later of: (1) the entry of judgment of conviction or sentence if no direct appeal is filed; or (2) an appellate court's disposition of petitioner's direct appeal." Act of June 2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 901, 1097–98 (codified at Minn.Stat. § 590.01). With regard to the effective date of the amendment, the legislature provided, "[a]ny person whose conviction became final before August 1, 2005, shall have two years after the effective date of this act [August 1, 2005] to file a petition for postconviction relief." *Id.* Because Scott's conviction became final in 1993, the statute of limitations required Scott to file his petition by July 31, 2007. Scott concedes that his petition was filed after the July 31, 2007, deadline, but argues that two of the statutory exceptions to the time bar apply.[3]

In its amendment of the postconviction statute in 2005, the legislature also created five exceptions to the two-year statute of limitations for filing a petition for postconviction relief. Minn.Stat. § 590.01, subd. 4(b)(1)-(5). Scott's argument rests on two

of these exceptions. First, the newly discovered evidence exception applies to allegations of newly discovered evidence that could not have been ascertained by the exercise of due diligence, that is not cumulative, that is not for impeachment, and that establishes by a clear and convincing standard that the petitioner is innocent. Minn.Stat. § 590.01, subd. 4(b)(2). Second, the interests of justice exception allows an untimely petition to be heard when "the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice." Minn.Stat. § 590.01, subd. 4(b)(5).

The postconviction court ruled that the newly discovered evidence exception to Minn.Stat. § 590.01, subd. 4(a), did not apply because Scott failed, as required by the exception, to prove by clear and convincing evidence that he is innocent. The postconviction court also held that the statute's interests of justice exception did not entitle Scott to relief because "there was overwhelming evidence proving the Petitioner's guilt, exclusive of Agent Riley's testimony" and therefore granting Scott an evidentiary hearing would be "contrary to the interests of justice."

## I.

■ As was the case in *Gassler,* the only question before us in this case is whether the newly discovered evidence or interests of justice exceptions found in Minn.Stat. § 590.01, subd. 4(b), permit Scott's untimely postconviction petition to be heard.

Scott claims that his petition for postconviction relief is not time barred because Minn.Stat. § 590.01, subd. 4(b)(2)'s, newly discovered evidence exception permits his petition to be heard. In order for that

---

**3.** There is no dispute here that Scott's postconviction petition was filed within two years

of his learning of the statement made in the FBI's November 2007 press release.

exception to apply, a petitioner must: (1) allege the existence of newly discovered evidence; (2) which could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the two-year time period for filing a postconviction petition; (3) which is not cumulative to evidence presented at trial; (4) is not for impeachment purposes; and (5) which establishes by a clear and convincing standard that the petitioner is innocent of the offense for which the petitioner was convicted. Minn.Stat. § 590.01, subd. 4(b)(2). The postconviction court held that Scott satisfied the first four prongs of this test, but failed to establish the final prong. Neither Scott nor the State challenge the court's ruling with respect to the first four prongs of this test, therefore, there are no issues related to those prongs before us on appeal.

The fifth prong of the test requires that the evidence must establish by a "clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted." Minn.Stat. § 590.01, subd. 4(b)(2). Here, Scott's newly discovered evidence does not establish, by the clear and convincing standard, Scott's innocence.

Given the National Research Council report and the January 2009 letter from the FBI to the Minnesota Attorney General's Office, it is clear that subsequent scientific studies have undermined Agent Riley's testimony regarding CBLA evidence. The subsequent scientific studies, however, do not establish Scott's innocence by the clear and convincing standard. Had Agent Riley's testimony not been admitted, there was still a significant amount of properly admitted evidence supporting Scott's guilt. That evidence includes three separate incriminating statements that Scott made to fellow inmates and a childhood friend, one of which was extremely detailed and corroborated by the physical evidence found at the scene. Other evidence included testimony that Scott and Gassler were the last known persons to have been seen with Yungk. Yarbough testified that Scott and Gassler looked tired the morning after Yungk was killed and Gassler told her in front of Scott that "[h]e is dead," and that he and Scott had killed Yungk and left his body on the side of the road "to prove a point." Scott later told Joseph Myers that he had been at Yarbough's house the day that Gassler told Yarbough about his involvement in the murder, heard Gassler's statement, and was upset with Gassler for having told Yarbough. Scott was with Gassler the day after Yungk was killed and Gassler had in his possession a sawed off shotgun that smelled of gunpowder.

Under Minn.Stat. § 590.01, subd. 4(b)(2), the burden of presenting clear and convincing evidence of innocence is on the petitioner. On the record presented here, the fact that subsequent scientific studies undermine Agent Riley's testimony does not, without more, prove Scott's innocence. Scott has provided nothing more here. Because Scott has failed to establish his innocence of Yungk's murder by the clear and convincing standard, we hold that the district court did not err when it concluded that Scott was not entitled to have his untimely petition heard under the newly discovered evidence exception to the statutory time bar.

## II.

■ We now turn to Scott's claim that he is entitled to have his petition considered under the interests of justice exception to the statutory time bar. To have his petition considered under the interests of justice exception to the time bar, Scott must establish that his petition is not frivolous and is in the interests of justice. Minn.Stat. § 590.01, subd. 4(b)(5).

■ A petition is frivolous if it is perfectly apparent, without argument, that the petition is without merit. *See Johnson v. St. Paul City Ry. Co.,* 68 Minn. 408, 409, 71 N.W. 619, 619 (1897); *Bronzin Holding Co. v. McGee,* 166 Minn. 129, 130, 207 N.W. 199, 200 (1926) (holding that an answer is frivolous when insufficiency appears on mere inspection); *Black's Law Dictionary* 739 (9th ed.2009) (defining "frivolous" as "Lacking a legal basis or legal merit; not serious; not reasonably purposeful...."). Here, while the postconviction court did not specifically address whether Scott's petition is frivolous, the State does not contend that the petition is frivolous. Having established that Agent Riley's CBLA testimony lacked scientific support, Scott's petition challenging his conviction, based in part on that testimony, on its face has substantive merit. Therefore, we conclude that the petition is not frivolous.

With respect to Scott's claim that his petition should be considered in the interests of justice, the postconviction court declined to consider the petition under the statute's interests of justice exception because "there was overwhelming evidence proving [Scott's] guilt, exclusive of Agent Riley's testimony" and therefore granting Scott an evidentiary hearing would be "contrary to the interests of justice."

In *Gassler v. State,* 787 N.W.2d 575 (Minn.2010), we noted that we only apply the interests of justice in exceptional situations and identified a non-exclusive list of factors to be considered when making that determination. *Id.* at 585–87. Those factors include: (1) whether the petitioner's claim has substantive merit; (2) whether the petitioner deliberately and inexcusably failed to raise the issue on direct appeal; (3) the degree to which the party alleging error is at fault for that error; (4) the degree of fault assigned to the party de-

fending the alleged error; and (5) whether some fundamental unfairness to the defendant needs to be addressed. *Id.* at 586–87. While we noted that we are compelled to act in the interests of justice when necessary to protect the integrity of judicial proceedings, we recognized that under certain circumstances the *reversal* of a conviction may seriously affect the fairness, integrity, or public reputation of judicial proceedings. *Id.*

Applying the factors identified in *Gassler* to Scott's claims, we conclude, as we did in *Gassler,* that the interests of justice do not require us to except this case from the time bar set out in Minn.Stat. § 590.01, subd. 4(a). It is undisputed that the scientific evidence directly linking Scott to Yungk's murder admitted by the court at trial was later determined to be unsupported by science and that Scott has not had an opportunity to have the effect of this improperly admitted evidence on his conviction evaluated. Further, we are satisfied that Scott was not at fault for the admission of Agent Riley's testimony and that he did not unreasonably or deliberately delay the filing of his postconviction petition.

Nonetheless, we conclude that the district court did not err when it concluded that it would be "contrary to the interests of justice" to hear Scott's untimely petition. The admissible evidence supporting Scott's conviction, as detailed above, is both substantial and compelling. The admission of Agent Riley's CBLA testimony did not make the trial so fundamentally unfair to Scott as to require us to act to protect the integrity of the judicial process. Rather, given the nature and extent of that evidence, "we conclude that it would be a miscarriage of justice" to consider Scott's petition under Minn.Stat. § 590.01, subd. 4(b)(5), in the interests of justice. *State v. Griller,* 583 N.W.2d 736,

742 (Minn.1998) (declining to reverse the defendant's conviction despite the undisputed plain error in the jury instructions). Therefore, we hold that the postconviction court did not err when it declined to consider Scott's petition in the interests of justice under Minn.Stat. § 590.01, subd. 4(b)(5).

Affirmed.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

GILDEA, Chief Justice (concurring).

For the reasons set forth in my concurrence in *Gassler v. State,* 787 N.W.2d 575, 588–91 (Minn.2010), I concur in the result.

DIETZEN, Justice (concurring).

I join in the concurrence of Chief Justice Gildea.