John MILES, petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. A10–2168.

Supreme Court of Minnesota.

Aug. 3, 2011.

779

Beau D. McGraw, McGraw Law Firm, P.A., Oakdale, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, MN, for respondent.

## OPINION

PAUL H. ANDERSON, Justice.

John Miles was convicted of the first-degree murder of Tyrone Harrell. We affirmed Miles's conviction on direct appeal in 1998. In 2010, Miles filed a petition for postconviction relief, and the postconviction court denied the petition without a hearing. Miles appeals the summary denial of his petition, arguing that he is entitled to postconviction relief based on newly discovered evidence. We affirm without prejudice to the filing of a new petition.

The facts set out in this opinion are limited to those facts relevant to Miles's claims on appeal from the denial of his postconviction petition. A more detailed description of the facts in this case can be found in our opinion on direct appeal. *State v. Miles*, 585 N.W.2d 368 (Minn. 1998).

On the evening of July 31, 1996, Tyrone Harrell was shot to death in a Minneapolis alley. *Id.* at 369. The police found Harrell lying dead in a driveway with a gunshot wound to his chest. *Id.* The police also found a green Jeep Cherokee nearby

with several bullet holes in its side. *Id.* Three eyewitnesses claimed to have observed the shooting. *Id.* K.B. saw a man with a gun jump out from behind a garage and shoot at the driver of the Jeep Cherokee. K.B. saw the Jeep's driver get out of the Jeep and run up the alley. *Id.* C.E. heard gunfire and looked out her window, which allowed her to view the alley. *Id.* She saw a man drop something that made a heavy and metallic sound and bend down as if to pick it up.[1] *Id.* Finally, B.B. saw a man jogging up the alley with his hand on his stomach. *Id.* All three witnesses identified appellant John Miles from a photo lineup as the person they had seen in the alley. *Id.* at 369–70.

The police had identified Miles as a potential suspect based on an earlier incident. *Id.* at 370. Two weeks before the shooting, Miles had reported to the Minneapolis police that a man known as "Tyrone" had robbed him. *Id.* Miles also reported that "Tyrone" drove a green Jeep Cherokee with the same license plate number as the one found at the scene of Harrell's shooting. *Id.* Based on this information and photo lineup identification, the police arrested Miles on September 15, 1996, for Harrell's murder. *Id.* Miles denied shooting Harrell and was released pending formal charges. *Id.*

In November 1996, Marcell Dupree Scott, who had been incarcerated on unrelated drug charges in September 1996, contacted the police from prison to discuss what he knew about Harrell's murder. *Id.* Scott reported that Miles had told him that a man named "Tyrone" had robbed him. *Id.* Scott also reported that Miles was extremely upset about the robbery, had been carrying two handguns, and was trying to find out where Harrell lived. *Id.*

Scott also reported that, on the night of the shooting, he and Miles were drinking together in the front yard of a house located in the neighborhood where Harrell was shot. *Id.* Scott said that Harrell drove past the two of them while they were in the front yard and then turned down the alley near the house. Miles left Scott and headed toward the alley. *Id.* Scott said that he subsequently heard some gunshots coming from the alley. *Id.* When Scott later talked with Miles, Miles told Scott that "the punk tried to run," but that Miles had chased him and "popped him a couple more times." *Id.* Miles was indicted on first-degree and second-degree murder charges on December 18, 1996. *Id.*

Before his trial, Miles moved for the admission of expert testimony on the subject of eyewitness identification, but the district court denied the motion. *Id.* at 370–71. At trial, Miles's defense was that, on the day of the shooting, he was painting a house during the entire day in preparation for moving into the house with his girlfriend. *Id.* at 371. But the State impeached Miles's alibi with evidence that he had moved several weeks later. *Id.* Scott testified for the State in exchange for the State's promise to provide financial assistance to his family, immunity from prosecution for aiding an offender, and the chance for earlier work-release. *Id.* at 370. Scott provided testimony that was the same as the information he previously provided to the police. *Id.*

On June 22, 1997, the jury found Miles guilty of first-degree murder, and the district court convicted him of that crime and sentenced him to life imprisonment. *Id.* at 371. On direct appeal, Miles argued that the court abused its discretion when it

---

1. The record does not indicate whether the individual that C.E. saw and identified was the shooter or the driver.

denied his motion to present expert testimony on eyewitness identification, and that the evidence was insufficient to convict him. *Id.* at 371–72. We affirmed Miles's conviction. *Id.* at 369–73.

Miles filed petitions for postconviction relief in 2004 and 2006, and the district court denied both petitions. Miles appealed the denial of his second petition to our court, and we dismissed the appeal in 2007. On July 26, 2010, Miles filed this petition—his third—for postconviction relief. He alleged that he was entitled to a new trial on the basis of newly discovered evidence, specifically, the information in a transcribed interview between Miles's new counsel and an individual named O.B. O.B.'s statement was purportedly taken by Miles's counsel in the counsel's office on January 4, 2010. O.B.'s statement was not notarized or taken under oath.

In this statement, O.B. stated that on the day of the shooting Miles had been at a barbeque near the scene of the crime. Scott was also present at the barbeque. O.B. stated that Scott had a grudge against Harrell, because Harrell "supposedly owed [Scott] some money or supposedly did something to [Scott]." While at the barbeque, Scott heard that Harrell had robbed Miles. According to O.B., Scott decided that the fact that Miles had a grudge against Harrell as a result of the robbery made it possible for Scott to shoot Harrell and then blame the shooting on Miles.

O.B. also described the shooting itself. He said that, as Harrell was driving down the alley, O.B. saw Scott jump out from behind a garage and shoot Harrell several times. O.B. stated that he did not come forward at the time of the shooting because he was afraid of Scott. He also said that there were other individuals who were aware of the events surrounding Harrell's shooting who refused to come forward when Miles was tried and convicted.

The postconviction court denied Miles's petition. Specifically, the court concluded that the petition was time-barred under Minn.Stat. § 590.01, subd. 4 (2010). The court considered whether the "newly discovered evidence" time-bar exception in subdivision 4(b)(2) applied. The court found that O.B.'s statement did not "establish by a clear and convincing standard" that Miles was innocent. *See* Minn.Stat. § 590.01, subd. 4(b)(2). The court then concluded that Miles was "conclusively" entitled to no relief, and denied his petition. Miles appealed to our court.

██ When we review a postconviction court's denial of relief, we review issues of law de novo. *Riley v. State,* 792 N.W.2d 831, 833 (Minn.2011). We "afford great deference to a ... court's findings of fact and will not reverse the findings unless they are clearly erroneous." *Id.*

██ The issue before us is whether the postconviction court erred when it concluded that Miles's postconviction petition was time-barred. Minnesota Statutes § 590.01, subdivision 4(a), provides, "No petition for postconviction relief may be filed more than two years after ... an appellate court's disposition of petitioner's direct appeal." Also, Act of June 2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 1080, 1097–98 provides, "Any person whose conviction became final before August 1, 2005, shall have two years after [August 1, 2005] to file a petition for postconviction relief." Miles's direct appeal was decided on October 8, 1998. Miles had two years after August 1, 2005, to file a postconviction appeal—until August 1, 2007. Miles's current postconviction petition was not filed until July 26, 2010, and therefore, unless an exception applies, Miles's petition is time-barred under Minn. Stat. § 590.01, subd. 4(a).

There are five exceptions to the time-bar provision of Minn.Stat. § 590.01, subd. 4. First, the petitioner may establish that a physical or mental disease "precluded a timely assertion of the claim." *Id.,* subd. 4(b)(1). Second, the petitioner may allege the existence of newly discovered evidence. *Id.,* subd. 4(b)(2). Third, the petitioner may assert a new interpretation of federal or state law, which applies retroactively to petitioner's case. *Id.,* subd. 4(b)(3). Fourth, the petitioner may bring the petition pursuant to subdivision 4(b)(4), which applies to convictions before May 1, 1980. *Id.,* subds. 3, 4(b)(4). Fifth, the petitioner may escape the time limitation by establishing "to the satisfaction of the court that the petition is not frivolous and is in the interests of justice." *Id.,* subd. 4(b)(5).

The only two exceptions that potentially apply to Miles's case are the "newly discovered evidence" exception and the "interests of justice" exception. *Id.,* subds. 4(b)(2), (5). Miles did not ask the postconviction court or our court to review his petition in the interests of justice, and therefore we will not do so. While he did not explicitly invoke the newly discovered evidence exception either, he has alleged each of the prongs of the newly discovered evidence exception. We said in *Roby v. State,* 787 N.W.2d 186, 191 (Minn.2010), that "a petition for postconviction relief does not need to include specific citation to a subdivision 4(b) exception to invoke it. Rather, the postconviction statutes require a court to look at the statement of the facts and the grounds upon which the petition is based." Further, Minn.Stat. § 590.04 directs courts to "liberally construe" a postconviction petition.

The newly discovered evidence exception of Minn.Stat. § 590.01, subd. 4(b)(2), contains several requirements, which are as follows:

[T]he petitioner alleges the existence of newly discovered evidence ... that could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the two-year time period for filing a postconviction petition, and the evidence is not cumulative to evidence presented at trial, is not for impeachment purposes, and establishes by a clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted. ...

There is no dispute that O.B.'s statement is not cumulative to evidence presented at trial and is not for impeachment purposes. Therefore, the only questions before us on appeal are (1) whether Miles could have, by the exercise of due diligence, ascertained O.B.'s statement within the two-year time period for filing a postconviction petition, and (2) whether O.B.'s testimony would establish by a "clear and convincing standard" that Miles is innocent of the first-degree murder of Harrell.

### Due Diligence

■ Miles argues that the postconviction court erred when it found that he and his trial counsel "could have discovered this alleged 'newly discovered evidence' by the exercise of due diligence prior to trial." Miles asserts that counsel "did a thorough job of preparation" and that "[O.B.]'s presence was not indicated in any way."

It appears that the postconviction court erred when it concluded that O.B.'s testimony could have been discovered by due diligence. We reach this conclusion for three reasons. First, the court failed to cite to anything in the record in support of its conclusion that O.B.'s testimony could have been discovered by due diligence. Second, Miles has asserted that O.B.'s presence at the scene of the crime could not have been ascertained because O.B. did not tell anyone of his knowledge of the

shooting. O.B.'s alleged statement supports Miles's assertion. O.B. stated that he was concerned for his safety, that he was afraid of Scott, and that he only came forward when he received assurances that his safety would be taken into account. It appears that O.B. was afraid of what Scott might do if O.B. came forward with information that Miles was not responsible for the shooting of Harrell. The third reason is that O.B. said that he did not know where Miles was when the shooting actually occurred. O.B. indicated that the shooting occurred as the barbeque was ending, and everybody, including Miles, was leaving.

There is no evidence that O.B. and Miles were together when O.B. witnessed the shooting, and we conclude that this is significant evidence that Miles did not have any reason to know at the time that O.B. was present when Harrell was shot. *Cf. Pierson v. State*, 637 N.W.2d 571, 577 (Minn.2002) ("The evidence clearly shows that Pierson and Smith were together throughout the events of October 5, 1993. Thus, Pierson undoubtedly knew that Smith had information regarding Pierson's involvement in those events."). Because there is evidence that O.B.'s statement could not have been discovered at the time, and no evidence that Miles knew of O.B.'s presence at the scene or knowledge of the crime, we conclude that the postconviction court's determination that Miles's counsel could have discovered O.B.'s statement by the exercise of due diligence lacks support and is clearly erroneous.

*Clear and Convincing Standard*

■ The postconviction court concluded that O.B.'s statement did not "establish by a clear and convincing standard that the Petitioner is innocent of the offense for which Petitioner was convicted." In reaching its conclusion, the postconviction court relied on the fact that O.B.'s state-

ment contradicted Miles's alibi at trial, and that O.B. waited 14 years before coming forward with his testimony.

■ We have twice considered the application of the requirement that a petitioner allege the existence of evidence that would prove his innocence by a "clear and convincing standard" under Minn.Stat. § 590.01, subd. 4(b)(2). In two related cases, *Gassler v. State*, 787 N.W.2d 575, 583 (Minn.2010), and *Scott v. State*, 788 N.W.2d 497, 502 (Minn.2010), we considered whether newly discovered evidence in the form of a report and a letter that undermined the testimony of a state firearms witness would establish the innocence of the petitioners by a "clear and convincing standard." In both cases, we concluded that even without the discredited firearms testimony, the record still contained substantial evidence of the petitioners' guilt. *Gassler*, 787 N.W.2d at 583; *Scott*, 788 N.W.2d at 502. In both *Gassler* and *Scott*, we concluded that the petitioners failed to allege evidence that would prove their innocence, and therefore, we held that the petitioners were not entitled to consideration of the petitions under the newly discovered evidence exception to Minn.Stat. § 590.01, subd. 4(b)(2). *Gassler*, 787 N.W.2d at 583; *Scott*, 788 N.W.2d at 502. *Gassler* and *Scott* demonstrate that unless the newly discovered evidence would on its face prove the petitioner's innocence by a clear and convincing standard, the petitioner has not met the requirements of Minn.Stat. § 590.01, subd. 4(b)(2).

■ Here, the postconviction court concluded that O.B.'s statement did not establish by a clear and convincing standard that Miles was innocent. But it appears that the court may have applied the wrong standard when it reached this decision. Under Minn.Stat. § 590.01, subd. 4(b)(2), the petitioner is not required to produce

evidence in his initial petition that actually proves his innocence. Requiring a petitioner to establish in his petition that newly discovered evidence proves his innocence would render the language "allege the existence of" meaningless. Such a conclusion would run counter to the legislative mandate that we construe every law to give effect to all its provisions. *See* Minn.Stat. § 645.16 (2010). Rather, the petitioner is required to sufficiently allege *the existence* of evidence which, if true, would establish the petitioner's innocence by clear and convincing evidence. Therefore, we conclude that the postconviction court applied the wrong legal test when it concluded that Miles failed to satisfy the newly discovered evidence exception on the grounds that the newly discovered evidence exception contradicted Miles's alibi at trial and because O.B. did not come forward for 14 years.

Our conclusion is consistent with *Gassler* and *Scott.* In those cases, the newly discovered evidence, as alleged by the petitioners, would not have proven the innocence of the petitioners. *Gassler,* 787 N.W.2d at 583; *Scott,* 788 N.W.2d at 502. But here, it appears that O.B.'s statement directly contradicts the single most important piece of evidence offered by the State during Miles's trial—Scott's testimony. Unlike the report and letter in *Gassler* and *Scott,* the alleged newly discovered evidence in this case would likely establish by clear and convincing evidence that Miles is innocent.

Despite our conclusion that the postconviction court applied the wrong standard when it analyzed O.B.'s statement, we nevertheless conclude that the court did not err when it denied Miles's petition without a hearing. As the court noted, O.B.'s statement was not notarized or taken under oath. We have previously recognized that the reliability provided by a sworn, notarized statement is a significant factor in the recantation context when determining whether a recantation warrants a new trial. Specifically, in *State v. Ferguson,* we said that "to justify the expense and risk of transporting the petitioner to an evidentiary hearing, it seems to us that the petitioner has an obligation to make a greater showing of a genuine recantation." 742 N.W.2d 651, 660 (Minn.2007); *see also Opsahl v. State,* 677 N.W.2d 414, 423 (Minn.2004). We conclude that Miles has the same obligation when alleging the existence of newly discovered evidence under Minn.Stat. § 590.01, subd. 4(b)(2). Because there is no indication on the record before us that O.B. will provide evidence or testimony as Miles alleges, we conclude that Miles has not made a sufficient allegation of newly discovered evidence to warrant relief under the statute. We therefore conclude that the postconviction court did not err when it concluded that Miles did not satisfy the requirements of the newly discovered evidence exception of Minn.Stat. § 590.01, subd. 4(b)(2).

Our conclusion that Miles has failed to offer evidence with sufficient indicia of reliability does not end our analysis. We have in the past granted petitioners an opportunity to file a new petition when the petitioner has alleged the existence of newly discovered evidence that tended to exonerate the petitioner, but bore insufficient indicia of reliability to justify granting a hearing. *See Ferguson,* 742 N.W.2d at 660. We conclude that the circumstances before us warrant a similar approach. The newly discovered evidence alleged in Miles's petition would tend to support his innocence of the crime for which he was convicted, but as presented to the court, it bears insufficient indicia of reliability to require an evidentiary hearing. We therefore affirm, but do so without prejudice to the filing of a new petition. If Miles can base a new petition on a more satisfactory

showing of a genuine statement from O.B., he is entitled to file a new petition.

Affirmed.