LILLEHAUG, Justice.
In 2008 a jury found appellant Kenneth Eugene Andersen guilty of first-degree premeditated murder, Minn. Stat. § 609.185(a)(1) (2016), for the April 2007 shooting death of Chad Swedberg in Becker County. We affirmed his conviction on direct appeal, State v. Andersen (Andersen I ), 784 N.W.2d 320, 323 (Minn. 2010), and affirmed the postconviction court's summary denial of his first postconviction petition, Andersen v. State (Andersen II ), 830 N.W.2d 1, 14 (Minn. 2013).
Now before us is Andersen's second petition for postconviction relief, claiming newly discovered evidence, ineffective assistance of trial counsel, and a Brady violation. The postconviction court denied the petition without holding an evidentiary hearing. We affirm in part, reverse in part, and remand for further proceedings.
FACTS
Chad Swedberg lived in Becker County with his wife, Leslie Fain, her son, Jesse Fain, and other members of the Fain family. On the morning of April 13, 2007, Swedberg left his home to work at a nearby maple syruping camp. Shortly thereafter, two shots were fired, and Swedberg's body was found at the camp. Almost no evidence was found at the scene, but suspicion soon fell upon Andersen after he made several misrepresentations to investigators. Andersen was indicted by a grand jury on one count of murder in the first degree, and at trial the State presented the following evidence.[1]
Swedberg and Andersen were good friends, but their friendship had soured in the months before Swedberg's death. In August 2006, an ATV was reported stolen from a residence where Swedberg and Andersen were performing construction work. Andersen later confessed to Swedberg that he had stolen the ATV, and a *420 few months later the ATV was found on Swedberg's property. Andersen was charged with theft of the ATV, and Swedberg was not happy that it was found near his home.[2] Also, about one week before Swedberg was killed, he decided not to participate with Andersen in a leeching business. Leslie Fain testified that Swedberg planned to start a greenhouse business instead.
At 7:46 a.m. on April 13, 2007, Andersen called Swedberg and asked him for a ride to Fargo so he could apply for a loan. Swedberg told Andersen that he could not give him a ride that morning because he was making maple syrup with Al Baker. Six minutes later, at 7:52 a.m., Andersen called Baker and asked him to stop by Andersen's house on the way to the camp. Baker agreed to stop by the house, but told Andersen that he first needed to buy groceries.
According to Leslie Fain, she heard two gun shots at approximately 8:13 a.m. Concerned for Swedberg's well-being, she called his cell phone several times. After getting no answer, she went to investigate the campsite. There she found Swedberg's body. Swedberg was shot twice-once in the right shoulder and once in the left buttock-and had bled to death. The bullets were not fired from close range. A firearms examiner determined that the bullets came from a .30-caliber weapon.
Investigators first spoke with Andersen a few days after Swedberg's death. Andersen was not a suspect, but during that conversation he made several statements that aroused suspicions. First, Andersen told investigators that he had a meeting with his tax preparer at 9:00 or 9:30 a.m. on the morning of the murder. He did meet with his tax preparer in Mahnomen around 10:00 a.m., but the meeting had been scheduled for 2:00 p.m. Second, Andersen told investigators that he had an appointment with a banker at 11:00 a.m. Although he met with a banker in Moorhead that day, he did not have a scheduled appointment. Third, Andersen told investigators that he left for these appointments between 8:30 and 9:00 a.m. But he did not call his relative for a ride until about 9:17 a.m., and he did not leave for Fargo until at least 9:34 a.m. In short, the timeline could not account for Andersen's whereabouts at the time of the shooting.
Investigators secured a search warrant for Andersen's home, which was located 1.3 miles from where the shooting occurred. Andersen told investigators that he owned "a 410 ... a pump action shotgun, a 12 gauge shotgun, a 222 and a muzzle loader," but did not volunteer that he also owned a .30-caliber rifle. At the time, the public was not aware that a .30-caliber rifle had fired the fatal shots.
When the investigators arrived, Andersen initially consented to the search. But when police began to search the outbuildings on his property, Andersen became angry. The police told him that a search warrant had been issued. The search of one of the outbuildings-the barn-uncovered a Tikka T3 Lite .300 Winchester short magnum rifle.[3] The rifle had been concealed under insulation and Andersen's palm print was on it. Investigators also found bullets in the home. A firearms examiner concluded that the rifle could have fired the bullets removed from Swedberg's body, and that the bullets found in Andersen's home had characteristics similar to the bullets removed from Swedberg's body. The serial number on the rifle *421 matched the serial number of a gun that Swedberg had purchased the prior year.
The jury found Andersen guilty of first-degree premeditated murder, and he was sentenced to life in prison without the possibility of release. We affirmed Andersen's conviction on direct appeal, rejecting his arguments regarding search warrant deficiencies, attorney-client phone calls being monitored, jurors being improperly questioned, and the sufficiency of the evidence. Andersen I , 784 N.W.2d at 323, 329, 332-36.
Andersen brought his first postconviction petition in 2010, raising six claims: (1) newly discovered evidence existed in an affidavit from his mother, (2) recordings of phone calls Andersen made while in jail were admitted in violation of his right to counsel, (3) the prosecutor committed misconduct by arguing that Andersen was the only person who possessed a "secret" .30-caliber gun, (4) the State withheld evidence, (5) evidence was introduced in violation of the Confrontation Clause, and (6) ineffective assistance of trial and appellate counsel, in part because trial counsel did not properly investigate the case. Andersen II , 830 N.W.2d at 6-8, 13. The petition was summarily denied by the postconviction court, and we affirmed. Id. at 5.
In September 2016, Andersen filed his second postconviction petition, now before us, alleging the existence of 16 pieces of newly discovered evidence found in 15 underlying documents, most of which were obtained by a private investigator. According to Andersen, his second petition was proper because it satisfied the newly-discovered-evidence and interests-of-justice exceptions to the postconviction statute's 2-year statute of limitations. In the alternative, he asked the postconviction court to use its supervisory powers to order a new trial in the interests of justice. Andersen argued that the newly discovered evidence shows the following:
1. An interview with Al Baker and an affidavit from Geraldine Bellanger showing that: (1) Baker was at the syruping camp as early as 8:00 a.m. and found a bullet and cigarette butts left by the shooter, and (2) Baker sent his .308-caliber rifle to his brother in Illinois, not to his niece in Alaska. Bellanger's statement also recounts a conversation that she had with Lisa Swedberg, wherein Lisa told Bellanger that Baker told Lisa that "voices in his head told him to kill [Swedberg]."
2. Almost 10 minutes of an interview with Baker allegedly showing that Baker received two phone calls from someone claiming to have killed Swedberg.
3. A witness contact form showing that Andersen did not leave his tax preparer's office with a copy of his taxes, but instead only left with a reference copy.
4. An interview with Wanda Nelson showing that Andersen called his tax preparer's office to request that she fax his tax returns to his bank, and that he did not physically return to the office to get a copy of his taxes.
5. An interview with Douglas Haverkamp showing that Haverkamp was unwilling to speak with Andersen's investigator before trial because he was afraid of Andersen.
6. An interview with Bradley Riggle also showing that Haverkamp and Riggle intended to drive to Ulen to have Haverkamp's taxes done.
7. An interview with Officer Jeffrey Nelson showing that, contrary to Officer Nelson's trial testimony, Swedberg knew that the stolen ATV was hidden on his property.
*422 8. Andersen's trial investigator "obtained a recording of Liz Andersen handing an envelope of cash to [Swedberg and Leslie Fain] inside a Wal-Mart, corroborating [Andersen's] statement [that] he had sold the Tikka rifle to [Swedberg]...."
9. Several documents showing that Andersen's cell phone was in such poor condition on April 13 that he could not use it for more than a few moments at a time unless it was plugged in.
10. An interview with Tonya Gunderson showing that Swedberg was having an affair with her shortly before his death.
11. An affidavit from Stacy Weaver stating that Leslie Fain, Jesse Fain, and possibly Leslie's brother "were seen driving on Highway 34 between 7:30 and 8:00 a.m. on April 13...."
12. An interview with Steven Lhotka showing that Lhotka never spoke with Leslie Fain or Swedberg about selling them a greenhouse.
13. A statement from Gary Underdahl showing that Swedberg's brother, Kenneth, rolled Swedberg's body over to search his pockets, which "provided an opportunity to know of the bullet hole size."
14. A statement from Josh Bogatz that he "dropped off a Tikka rifle at the home of [Swedberg] on behalf of [Andersen]" in 2006.
15. A statement from Liz Andersen that she handed Swedberg an envelope of cash from Andersen in a Wal-Mart in December 2006.
The postconviction court denied Andersen's second petition without holding an evidentiary hearing. It concluded the petition was untimely because the facts alleged in the petition did not satisfy the statutory newly-discovered-evidence exception. As part of its analysis, the court determined that two supporting documents-the Weaver and Bellanger affidavits-were, respectively, "inherently unreliable" and "inherently dubious." The postconviction court further explained that, unlike our court, it did not have supervisory powers over the justice system that would allow it to order a new trial in the interests of justice.
ANALYSIS
Andersen argues that the postconviction court abused its discretion by denying his petition for postconviction relief without holding an evidentiary hearing.
We review a postconviction court's summary denial of a petition for postconviction relief for an abuse of discretion. Zornes v. State , 903 N.W.2d 411, 416 (Minn. 2017). "A postconviction court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." Brown v. State , 895 N.W.2d 612, 617 (Minn. 2017) (citation omitted) (internal quotation marks omitted).
The postconviction statute authorizes "a person convicted of a crime" to seek postconviction relief by filing a petition claiming that the conviction "violated the person's rights under the Constitution or laws of the United States or of the state." Minn. Stat. § 590.01, subd. 1(1) (2016). Upon filing a petition for postconviction relief, an evidentiary hearing must be held "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn. Stat. § 590.04, subd. 1 (2016). "In determining whether an evidentiary hearing is required, a postconviction court considers the facts alleged in the petition as true and construes them in the *423 light most favorable to the petitioner." Brown , 895 N.W.2d at 618. A petition that is filed outside the statute of limitations may be summarily denied, Colbert v. State , 870 N.W.2d 616, 622 (Minn. 2015), unless a statutory exception applies, see Minn. Stat. § 590.01, subd. 4(b) (2016).
According to Andersen, the postconviction court abused its discretion when it declared Weaver's affidavit to be "inherently unreliable" and Bellanger's affidavit "inherently dubious" without first holding an evidentiary hearing to assess those witnesses' credibility. He also argues that his claims are not time-barred because the facts alleged in support of the claims satisfy the newly-discovered-evidence or interests-of-justice exceptions to the 2-year statute of limitations.[4] See Minn. Stat. § 590.01, subd. 4(b)(2), (5). We consider Andersen's arguments in turn.
I.
Andersen argues that the postconviction court abused its discretion by making improper credibility determinations without holding an evidentiary hearing. We agree.
We have repeatedly instructed postconviction courts that they may not find a postconviction affiant unreliable without first holding an evidentiary hearing to assess the affiant's credibility. See, e.g. , Wilson v. State , 726 N.W.2d 103, 107 (Minn. 2007) (explaining that we have "cautioned postconviction courts not to determine that a recantation is unreliable without first taking the opportunity to evaluate the credibility of the witness at an evidentiary hearing"). Despite this admonition, postconviction courts have continued to assess affiant credibility without holding an evidentiary hearing.[5]
The postconviction court repeated this error here when it considered the credibility of two pieces of evidence-affidavits from Weaver and Bellanger. Andersen cites Weaver's affidavit to show that Leslie and Jesse Fain "were seen driving on Highway 34 between 7:30 and 8:00 a.m. on April 13." He cites Bellanger's affidavit to show that: (1) Baker told her that he never sent a .30-caliber rifle to Alaska, (2) Baker told her that at trial he thanked Andersen for not shooting him, (3) Baker received two calls on the day of Swedberg's funeral from a person claiming to have killed Swedberg, and (4) Andersen sold a Tikka rifle to Swedberg in 2006. The Bellanger statement also recounts a conversation that Bellanger had with Lisa Swedberg, wherein Lisa told Bellanger that Baker admitted that "voices in his head told him to kill [Swedberg]." Further, the Bellanger statement claims that Lisa and Kenneth Swedberg told Bellanger that Baker "confess[ed] or [got] a confession."
In addressing these affidavits, the postconviction court declared Weaver's affidavit "inherently unreliable" and Bellanger's affidavit "inherently dubious." The postconviction court found Weaver's affidavit "unreliable" because, in its view, "an uncorroborated statement of briefly observing Leslie and Jesse in a car between 7:30-8:00 a.m., when all other testimony indicates they were not, is too implausible to require an evidentiary hearing." The court found Bellanger's affidavit "dubious" because *424 Andersen failed to mention Baker's alleged confession in his supporting memorandum, one of the facts alleged in the affidavit was inconsistent with the trial transcript, and other allegations in the affidavit were not supported by evidence.
These findings by the postconviction court were improper credibility determinations. We reiterate that, when considering a postconviction petition, a postconviction court cannot make credibility determinations without first holding an evidentiary hearing. See Henderson v. State , 906 N.W.2d 501, 507 (Minn. 2018) ; see also Minn. Stat. § 590.04, subd. 1.
In the past, when courts have disregarded our rulings, see State v. Lefthand , 488 N.W.2d 799, 801-02 (Minn. 1992), or when the integrity of the fact-finding process has needed protection, see Pederson v. State , 649 N.W.2d 161, 164-65 (Minn. 2002), we have exercised our supervisory powers, which include the power to reverse a case prophylactically, see State v. Salitros , 499 N.W.2d 815, 820 (Minn. 1993). After all, "[j]ustice is a process, not simply a result." Lefthand , 488 N.W.2d at 802.
To encourage future compliance with the rule that a postconviction court must not make credibility determinations without first holding an evidentiary hearing, a prophylactic reversal is required in this case. On remand, the postconviction court must assume that the facts alleged in the Bellanger and Weaver affidavits are true, construe them in the light most favorable to Andersen, and then assess whether, under Minn. Stat. § 590.04, subd. 1, an evidentiary hearing is required.[6] If the district court concludes that an evidentiary hearing is required, it shall "promptly set an early hearing on the petition and response thereto, and promptly determine the issues, make findings of fact and conclusions of law with respect thereto, and either deny the petition or enter an order granting appropriate relief." Minn. Stat. § 590.04, subd. 1. If the court concludes that an evidentiary hearing is not required, it must explain in detail why Andersen is conclusively entitled to no relief. See Henderson , 906 N.W.2d at 507 ("[W]hen determining whether to summarily deny relief, a postconviction court must accept the evidence as true."); Brown , 895 N.W.2d at 618 ("In determining whether an evidentiary hearing is required, a postconviction court considers the facts alleged in the petition as true and construes them in the light most favorable to the petitioner.").
II.
We next consider whether the facts alleged in support of Andersen's remaining claims satisfy the newly-discovered-evidence or interests-of-justice exceptions to the 2-year statute of limitations. It is undisputed that Andersen filed his petition more than 2 years after we affirmed his conviction on direct appeal. See Minn. Stat. § 590.01, subd. 4(a) (2016) ("No petition for postconviction relief may be filed more than two years after the later of: (1) the entry of judgment of conviction or sentence if no direct appeal is filed; or (2) an appellate court's disposition of petitioner's direct appeal."). Thus, it was proper for the postconviction court to summarily deny Andersen's petition on statute-of-limitations grounds unless a statutory exception applies. The issue, then, is whether the remaining facts alleged in the petition and the files and records of the proceeding, when considered to be true and viewed in *425 a light most favorable to Andersen, satisfy either the newly-discovered-evidence or interest-of-justice exceptions to the 2-year statute of limitations. We conclude that they do not.
A.
The newly-discovered-evidence exception requires a petitioner to show that the evidence: (1) is "newly discovered," (2) "could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the two-year time period for filing a postconviction petition," (3) "is not cumulative to evidence presented at trial," (4) "is not for impeachment purposes," and (5) "establishes by a clear and convincing standard that the petitioner is innocent of the offense ... for which the petitioner was convicted." Minn. Stat. § 590.01, subd. 4(b)(2) (emphasis added). The fifth requirement is "more stringent" than the Rainer standard, which only applies to timely-filed petitions.[7] Rhodes v. State , 875 N.W.2d 779, 788 (Minn. 2016). We have stated that the "clear and convincing standard" is satisfied only when the evidence is "unequivocal, intrinsically probable, and free from frailties." Id. (citation omitted).
Andersen's newly-discovered-evidence claims can be grouped into four categories: (1) evidence that was, or through the exercise of due diligence could have been, ascertained within the 2-year time period for filing a postconviction petition, (2) evidence that is for impeachment purposes, (3) evidence that, even when considered to be true and viewed in a light most favorable to Andersen, fails to establish by a clear and convincing standard that he is innocent, and (4) evidence that is being presented in unsworn investigative reports. We address each category in turn.
1.
Even when considered to be true and viewed in a light most favorable to Andersen, two of his newly-discovered-evidence claims involve evidence that was known to Andersen before the 2-year time period for filing a postconviction petition expired. As a result, these claims do not satisfy the second statutory requirement of the newly-discovered-evidence exception to the 2-year statute of limitations-that the evidence "could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the two-year time period for filing a postconviction petition." Minn. Stat. § 590.01, subd. 4(b)(2).
In support of the first claim, Andersen cites a transcript of an April 2007 interview with Al Baker to show that "Baker report[ed] having received two phone calls from someone claiming to have killed [Swedberg]." Even when viewing the record in a light most favorable to Andersen, it establishes that Andersen was aware of the contents of the entire April 2007 interview on or before November 8, 2011, which is the date he filed his pro se supplemental brief in Andersen II . On page 11 of his pro se supplemental brief, Andersen discusses the contents of the entire April 2007 interview, including a phone call from someone claiming to have killed Swedberg. Because Andersen was aware of this missing transcript no later than November 8, 2011, it is not newly discovered evidence.[8]
*426 In support of the second claim, Andersen cites several documents to show that his cell phone was in poor condition on April 13, 2007. He claims that this evidence shows that "he couldn't use [the phone] for more than a few moments at a time unless it was plugged in." The potential inference is that if Andersen could have only placed the morning phone calls to Swedberg and Baker from his home, it might have been difficult for him to reach the syruping camp by 8:13 a.m. Plainly this evidence was ascertainable before the statute of limitations expired because Andersen knew about his own cell phone's condition before his trial. See, e.g. , Evans v. State , 788 N.W.2d 38, 49 (Minn. 2010) (holding that evidence is not "newly discovered" if the petitioner was admittedly present at the time of the events in question (citations omitted) ).
Even when the alleged facts are considered to be true and viewed in a light most favorable to Andersen, these claims fail to satisfy the second statutory requirement of the newly-discovered-evidence exception to the 2-year statute of limitations because they were known to Andersen before the statute of limitations expired. See Minn. Stat. § 590.01, subd. 4(b)(2). Thus, the postconviction court did not abuse its discretion in summarily denying the claims regarding the Baker interview and Andersen's cellphone.
2.
Even when considered to be true and viewed in a light most favorable to Andersen, three of his newly-discovered-evidence claims involve evidence that does nothing more than impeach prior testimony. In support of the first claim, Andersen points to Wanda Nelson's witness contact form to show that Andersen did not leave her office with a copy of his taxes. In support of the second claim, Andersen cites a 2007 interview with Brad Riggle (Douglas Haverkamp's then-roommate) to contradict trial testimony that Haverkamp did not intend to have his taxes done on April 13, 2007. In support of his third claim, Andersen cites a signed statement from Gary Underdahl that Kenneth Swedberg told Underdahl that, upon arriving at the scene of the shooting, he rolled Swedberg's body over and rummaged through his pockets to remove drug paraphernalia. Underdahl's statement would impeach Kenneth Swedberg's trial testimony that he only checked Swedberg's neck for a pulse.
Because the Nelson witness contact form, the Riggle interview, and the Underdahl statement do nothing more than impeach prior testimony, these claims fail to satisfy the statutory requirement that the newly discovered evidence be "not for impeachment purposes." Minn. Stat. § 590.01, subd. 4(b)(2). Thus, the postconviction court did not abuse its discretion in summarily denying the claims regarding the witness contact form, the Riggle interview, and the Underdahl statement.
3.
Even when considered to be true and viewed in a light most favorable to *427 Andersen, two of the signed statements cited by Andersen do not clearly and convincingly show his innocence. First, he cites a signed statement from Josh Bogatz (Andersen's step-nephew), which states that in 2006, Bogatz "dropped off a Tikka rifle at the home of [Swedberg] on behalf of [Andersen]." Second, he cites a notarized statement from Liz Andersen (Andersen's sister), which states that in December 2006, she gave Swedberg an envelope of cash "that was owed to [him] from working with [Andersen]."
These statements do not clearly and convincingly show Andersen's innocence.[9] Minn. Stat. § 590.01, subd. 4(b)(2). Andersen fails to explain how the alleged firearm transfer establishes his innocence. Further, no such explanation is discernable from the record, considering that: (1) a .30-caliber rifle was found on Andersen's property, (2) Andersen tried to conceal this rifle, and (3) Andersen's palm print was found on this rifle. Thus, the postconviction court did not abuse its discretion in summarily denying the claims regarding the 2006 firearm transfer.
4.
Andersen bases his remaining newly-discovered-evidence claims on six unsworn investigative reports. First, he cites the investigative report of an interview with Baker to show that Baker was at the scene of the crime at 8:00 a.m. and found a bullet and cigarette butts left by the shooter. He also cites this report to show that Baker sent his .308-caliber rifle to his brother in Illinois, not to his niece in Alaska. Second, he cites the investigative report of an interview with Wanda Nelson to show that: (1) contrary to trial testimony, Andersen called her office to request a copy of his tax returns, and (2) Nelson allegedly had "racial bias toward Native Americans." Third, he cites the investigative report of an interview with Riggle to contradict Haverkamp's trial testimony that he did not intend to have his taxes done on April 13, and to show that Haverkamp was afraid of Andersen and "unwilling to speak with his investigator at an earlier time." Fourth, he cites an investigative report of an interview with Officer Nelson to show that, contrary to trial testimony, Swedberg knew the stolen ATV was on his property.[10] Fifth, he cites an investigative report of an interview with Tonya Gunderson to show that Swedberg was having an affair shortly before his death. Sixth, he cites an investigative report of an interview with Steven Lhotka to show that Swedberg had never spoken with Lhotka about buying a greenhouse.
We have previously held that an unnotarized, unsworn statement is insufficient to satisfy the requirements of the newly- *428 discovered-evidence exception to the 2-year statute of limitations. Miles v. State , 800 N.W.2d 778, 784 (Minn. 2011) ; see also Laine v. State , 786 N.W.2d 635, 638 (Minn. 2010) ("[A] memorandum written by a defense investigator declaring that a witness provided different information to the investigator than the witness provided at trial [is] insufficient to warrant an evidentiary hearing." (citing State v. Ferguson , 742 N.W.2d 651, 659-60 (Minn. 2007) ) ). In Miles , we affirmed the summary denial of the defendant's postconviction petition on these grounds, but did so without prejudice to the filing of a new petition. 800 N.W.2d at 784.
Like the statement in Miles, the six unsworn investigative reports do not satisfy the requirements of the newly-discovered-evidence exception to the 2-year statute of limitations. Accordingly, we affirm the postconviction court's summary denial of the claims that were based on the unsworn investigative reports without prejudice to the filing of a new petition.[11]
B.
Andersen argues, alternatively, that the facts alleged in the petition satisfy the interests-of-justice exception to the 2-year statute of limitations. See Minn. Stat. § 590.01, subd. 4(b)(5). The statutory interests-of-justice exception is only invoked in "exceptional and extraordinary situations." Carlton v. State , 816 N.W.2d 590, 607 (Minn. 2012) (citations omitted) (internal quotation marks omitted). To invoke this exception, "[t]he claim must relate to an injustice that delayed the filing of the petition, not to the substantive merit of the petition." Hooper v. State , 888 N.W.2d 138, 142 (Minn. 2016) (citing Sanchez v. State , 816 N.W.2d 550, 557 (Minn. 2012) ). Viewing the facts alleged in a light most favorable to Andersen, we conclude that they fail to establish an injustice that delayed the filing of his second postconviction petition.
Andersen argues that the following circumstances warrant invoking the interests-of-justice exception to the 2-year statute of limitations: (1) he faced challenges in obtaining some documents, (2) his jail calls were monitored, (3) "misrepresentations were made regarding his actions during the search of his premises and in obtaining a search warrant," (4) his counsel refused to turn over discovery and trial evidence, and (5) witnesses were "instructed not to cooperate with his investigation." In support of this last claim, Andersen relies on the transcript of a March 2008 omnibus hearing where his investigator testified that two witnesses were allegedly told "not to talk."[12] But even when viewed in a light most favorable to Andersen, the facts alleged in support of these claims do not explain the 6-year delay in the filing of his second postconviction petition. Therefore, they fail to satisfy the statutory interests-of-justice exception to the 2-year statute of limitations.[13]
*429 Accordingly, Andersen's petition does not demonstrate the exceptional circumstances necessary to invoke the statutory interests-of-justice exception.[14]
CONCLUSION
For the foregoing reasons, we affirm the decision of the postconviction court in part, reverse it in part, and remand for further proceedings.
Affirmed in part, reversed in part, and remanded.
THISSEN, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

A full description of the facts may be found in Andersen I , 784 N.W.2d 320.

The theft charge was dismissed following Andersen's conviction in this case.

The Tikka .300 rifle was capable of firing .30-caliber bullets.

Although the postconviction statute contains five exceptions to its statute of limitations, Andersen invokes only the newly-discovered-evidence and the interests-of-justice exceptions. See Minn. Stat. § 590.01, subd. 4(b).

See, e.g. , Henderson v. State , 906 N.W.2d 501, 507 (Minn. 2018) ; Caldwell v. State , 853 N.W.2d 766, 772-73 (Minn. 2014) ; Bobo v. State , 820 N.W.2d 511, 517 n.4 (Minn. 2012) ; Ferguson v. State , 779 N.W.2d 555, 560 (Minn. 2010) ; State v. Turnage , 729 N.W.2d 593, 597-98 (Minn. 2007).

Because we reverse prophylactically, we do not consider whether the facts alleged in the Weaver and Bellanger affidavits are sufficient to satisfy an exception to the 2-year statute of limitations and warrant a new trial.

The Rainer standard is almost identical to subdivision 4(b)(2), except that Rainer only requires that the newly discovered evidence "would probably produce an acquittal or a more favorable result." Rainer v. State , 566 N.W.2d 692, 695 (Minn. 1997) (emphasis added) (citation omitted).

Andersen also raised a Brady claim based on this transcript. See Brady v. Maryland , 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Because the Brady claim was known, but not raised in Andersen's first postconviction petition, the claim is Knaffla -barred. See Perry v. State , 731 N.W.2d 143, 146 (Minn. 2007) ("Claims asserted in a ... subsequent postconviction petition are procedurally barred under this court's Knaffla rule if they could have been raised on direct appeal or in a previous postconviction petition."); see also State v. Knaffla , 309 Minn. 246, 243 N.W.2d 737, 741 (1976). Accordingly, the postconviction court did not abuse its discretion when it summarily denied the petition. See Pearson v. State , 891 N.W.2d 590, 597 (Minn. 2017) ("[A] postconviction court may summarily deny a claim that is procedurally barred by the Knaffla rule." (citation omitted) ).

According to Andersen, the 2006 firearm transfer is corroborated by a surveillance video recording that purportedly shows Liz Andersen handing an envelope of cash to Swedberg and Leslie Fain. Although a transfer of cash from Swedberg to Andersen might have supported a claim that Swedberg purchased a firearm from Andersen, a transfer of cash from Andersen to Swedberg plainly does not.

Andersen's brief is unclear on what document supports this claim. His memorandum references "[e]vidence from an interview between [Officer] Nelson and Leslie and Jesse Fain," but the cited exhibit is the investigative report with Officer Nelson. Regardless, Andersen's claim is time-barred. The interview between Nelson and the Fains was known no later than December 2010. Andersen's memorandum in support of his first postconviction petition concedes that "[a]s [Andersen] was going through discovery, he ha[d] found that on December 4, 2007, [Officer] Nelson did an interview with Leslie and Jessie Fain." Thus, that interview is not "newly discovered." Minn. Stat. § 590.01, subd. 4(b)(2). The investigative report, as will be discussed, is also time-barred.

Andersen's supplemental pro se brief raises several other newly-discovered-evidence claims. These additional claims were not raised before the postconviction court in Andersen's memorandum of law. Accordingly, we will not consider these claims for the first time on appeal. See Roby v. State , 547 N.W.2d 354, 357 (Minn. 1996) ("This court generally will not decide issues which were not raised before the district court...." (citation omitted) ).

Andersen also relies on an affidavit from one of Andersen's trial defense attorneys that purportedly states that "witnesses had been instructed not to talk with defense counsel or their investigators." But the cited affidavit contains no such statement.

Andersen also argues that the facts warrant an exercise of our supervisory powers to order a new trial. See State v. Beecroft , 813 N.W.2d 814, 846 (Minn. 2012). We decline to do so here. We have already considered, and rejected, most of the claims that Andersen raises when we reviewed his case on direct appeal and in connection with his first postconviction petition. Nothing in Andersen's petition or briefs, or in our thorough review of the record, compels us to order a new trial at this point.

Andersen also raised a claim of ineffective assistance of trial counsel, alleging that counsel failed to adequately investigate his case. The postconviction court properly denied this claim. The claim was previously raised and rejected in Andersen II . 830 N.W.2d at 13 ("Andersen argues that trial counsel was ineffective because he was unprepared at trial, did not read the discovery, [and] failed to investigate the case ...." (emphasis added) ). As a result, the claim is Knaffla -barred, and the postconviction court did not abuse its discretion when it summarily denied this claim. See Pearson , 891 N.W.2d at 597 ("[A] postconviction court may summarily deny a claim that is procedurally barred by the Knaffla rule." (citation omitted) ).